(Slip Opinion) OCTOBER TERM, 2017 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WISCONSIN CENTRAL LTD. ET AL. *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 17–530.  Argued April 16, 2018—Decided June 21, 2018

As the Great Depression took its toll, struggling railroad pension funds reached the brink of insolvency.  During that time before the rise of the modern interstate highway system, privately owned railroads employed large numbers of Americans and provided services vital to the nation's commerce.  To address the emergency, Congress adopted the Railroad Retirement Tax Act of 1937.  That legislation federalized private railroad pension plans and it remains in force even today.  Under the law's terms, private railroads and their employees pay a tax based on employees' incomes.  In return, the federal government provides employees a pension often more generous than the social security system supplies employees in other industries.

This case arises from a peculiar feature of the statute and its history.  At the time of the Act's adoption, railroads compensated employees not just with money but also with food, lodging, railroad tickets, and the like.  Because railroads typically didn't count these in-kind benefits when calculating an employee's pension on retirement, neither did Congress in its new statutory pension scheme.  Nor did Congress seek to tax these in-kind benefits.  Instead, it limited its levies to employee "compensation," and defined that term to capture only "any form of money remuneration."

It's this limitation that poses today's question.  To encourage employee performance and to align employee and corporate goals, some railroads have (like employers in many fields) adopted employee stock option plans.  The government argues that these stock options qualify as a form of "compensation" subject to taxation under the Act.  In its view, stock options can easily be converted into money and so qualify as "money remuneration."  The railroads and their employees reply that stock options aren't "money remuneration" and remind the

Syllabus

Court that when Congress passed the Act it sought to mimic existing industry pension practices that generally took no notice of in-kind benefits. Who has the better of it?

*Held*: Employee stock options are not taxable "compensation" under the Railroad Retirement Tax Act because they are not "money remuneration."

When Congress adopted the Act in 1937, "money" was understood as currency "issued by [a] recognized authority as a medium of exchange." Pretty obviously, stock options do not fall within that definition. While stock can be bought or sold for money, it isn't usually considered a medium of exchange. Few people value goods and services in terms of stock, or buy groceries and pay rent with stock. Adding the word "remuneration" also does not alter the meaning of the phrase. When the statute speaks of taxing "any form of money remuneration," it indicates Congress wanted to tax monetary compensation in any of the many forms an employer might choose. It does not prove that Congress wanted to tax things, like stock, that are not money at all.

The broader statutory context points to this conclusion. For example, the 1939 Internal Revenue Code, adopted just two years later, also treated "money" and "stock" as different things. See, *e.g.*, §27(d). And a companion statute enacted by the same Congress, the Federal Insurance Contributions Act, taxes "all remuneration," including benefits "paid in any medium other than cash." §3121(a). The Congress that enacted both of these pension schemes knew well the difference between "money" and "all" forms of remuneration and its choice to use the narrower term in the context of railroad pensions alone requires respect, not disregard.

Even the IRS (then the Bureau of Internal Revenue) seems to have understood all this back in 1938. Shortly after the Railroad Retirement Tax Act's enactment, the IRS issued a regulation explaining that the Act taxes "all remuneration in money, or in something which may be used in lieu of money (scrip and merchandise orders, for example)." The regulation said the Act covered things like "[s]alaries, wages, commissions, fees, [and] bonuses." But the regulation nowhere suggested that stock was taxable.

In light of these textual and structural clues and others, the Court thinks it's clear enough that the term "money" unambiguously excludes "stock." Pp. 2–8.

856 F. 3d 490, reversed and remanded.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, and ALITO, JJ., joined. BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–530

_____

## WISCONSIN CENTRAL LTD., ET AL., PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 21, 2018]

JUSTICE GORSUCH delivered the opinion of the Court.

As the Great Depression took its toll, struggling railroad pension funds reached the brink of insolvency. During that time before the modern interstate highway system, privately owned railroads employed large numbers of Americans and provided services vital to the nation's commerce. To address the emergency, Congress adopted the Railroad Retirement Tax Act of 1937. That legislation federalized private railroad pension plans and it remains in force today. Under the law's terms, private railroads and their employees pay a tax based on employees' incomes. 26 U. S. C. §§3201(a)–(b), 3221(a)–(b). In return, the federal government provides employees a pension often more generous than the social security system supplies employees in other industries. See *Hisquierdo* v. *Hisquierdo*, 439 U. S. 572, 573–575 (1979).

Our case arises from a peculiar feature of the statute and its history. At the time of the Act's adoption, railroads compensated employees not just with money but also with food, lodging, railroad tickets, and the like. Because railroads typically didn't count these in-kind benefits when

calculating an employee's pension on retirement, neither did Congress in its new statutory pension scheme. Nor did Congress seek to tax these in-kind benefits. Instead, it limited itself to taxing employee "compensation," and defined that term to capture only "any form of money remuneration." §3231(e)(1).

It's this limitation that poses today's question. To encourage employee performance and align employee and corporate goals, some railroads (like employers in many fields) have adopted employee stock option plans. Typical of many, the plan before us permits an employee to exercise stock options in various ways—purchasing stock with her own money and holding it as an investment; purchasing stock but immediately selling a portion to finance the purchase; or purchasing stock at the option price, selling it all immediately at the market price, and taking the profits. App. 41–42. The government argues that stock options like these qualify as a form of taxable "money remuneration" under the Act because stock can be easily *converted* into money. The railroads reply that stock options aren't "money" at all and remind us that when Congress passed the Act it sought to mimic existing industry pension practices that generally took no notice of in-kind benefits. Who has the better of it? Courts have divided on the answer, so we agreed to take up the question.

We start with the key statutory term: "money remuneration." As usual, our job is to interpret the words consistent with their "ordinary meaning . . . at the time Congress enacted the statute." *Perrin* v. *United States*, 444 U. S. 37, 42 (1979). And when Congress adopted the Act in 1937, "money" was ordinarily understood to mean currency "issued by [a] recognized authority as a medium of exchange." Webster's New International Dictionary 1583 (2d ed. 1942); see also 6 Oxford English Dictionary 603 (1st ed. 1933) ("In mod[ern] use commonly applied indif-

ferently to coin and to such promissory documents representing coin (esp. government and bank notes) as are currently accepted as a medium of exchange"); Black's Law Dictionary 1200 (3d ed. 1933) (in its "popular sense, 'money' means any currency, tokens, bank-notes, or other circulating medium in general use as the representative of value"); *Railway Express Agency, Inc.* v. *Virginia*, 347 U. S. 359, 365 (1954) ("[M]oney . . . is a medium of exchange"). Pretty obviously, stock options do not fall within that definition. While stock can be bought or sold for money, few of us buy groceries or pay rent or value goods and services in terms of stock. When was the last time you heard a friend say his new car cost "2,450 shares of Microsoft"? Good luck, too, trying to convince the IRS to treat your stock options as a medium of exchange at tax time. See Rev. Rul. 76–350, 1976–2 Cum. Bull. 396; see also, *e.g., In re Boyle's Estate*, 2 Cal. App. 2d 234, 236 (1934) ("[T]he word 'money' when taken in its ordinary and grammatical sense does not include corporate stocks"); *Helvering* v. *Credit Alliance Corp.*, 316 U. S. 107, 112 (1942) (distinguishing between "money and . . . stock").

Nor does adding the word "remuneration" alter the calculus. Of course, "remuneration" can encompass any kind of reward or compensation, not just money. 8 Oxford English Dictionary 439. But in the sentence before us, the adjective "money" modifies the noun "remuneration." So "money" limits the kinds of remuneration that will qualify for taxation; "remuneration" doesn't expand what counts as money. When the statute speaks of taxing "any form of money remuneration," then, it indicates Congress wanted to tax monetary compensation in any of the many forms an employer might choose—coins, paper currency, checks, wire transfers, and the like. It does not prove Congress wanted to tax things, like stock, that aren't money at all.

The broader statutory context points to the same conclusion the immediate text suggests. The 1939 Internal

Revenue Code, part of the same title as our statute and adopted just two years later, expressly treated "money" and "stock" as different things. Consider a few examples. The Code described "stock of the corporation" as "property other than money." §27(d). It explained that a corporate distribution is taxable when distributed "either (A) in [the company's] stock . . . or (B) in money." §115(f)(2). And it discussed transfers of "money in addition to . . . stock or securities." §372(b). While ultimately ruling for the government, even the Court of Appeals in this case conceded that the 1939 Code "treat[ed] 'money' and 'stock' as different concepts." 856 F. 3d 490, 492 (CA7 2017).

That's not all. The same Congress that enacted the Railroad Retirement Tax Act enacted a companion statute, the Federal Insurance Contributions Act (FICA), to fund social security pensions for employees in other industries. And while the Railroad Retirement Tax Act taxes only "*money* remuneration," FICA taxes "*all* remuneration"—including benefits "paid in any medium other than cash." §3121(a) (emphasis added). We usually "presume differences in language like this convey differences in meaning." *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. ___, ___ (2017) (slip op., at 6). And that presumption must bear particular strength when the same Congress passed both statutes to handle much the same task. See *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 432 (1987). The Congress that enacted both of these pension schemes knew well the difference between "money" and "all" forms of remuneration. Its choice to use the narrower term in the context of railroad pensions alone requires respect, not disregard.

Even the IRS (then the Bureau of Internal Revenue) seems to have understood all this back in 1938. Shortly after the Railroad Retirement Tax Act's enactment, the IRS issued a regulation explaining that the Act taxes "all remuneration in money, or in something which may be used in lieu of money." 26 CFR §410.5 (1938). By way of

example, the regulation said the Act taxed things like "[s]alaries, wages, commissions, fees, [and] bonuses." §410.6(a). But it nowhere suggested that stock was taxable. Nor was the possibility lost on the IRS. The IRS said the Act *did* tax money payments *related* to stock— "[p]ayments made by an employer into a stock bonus . . . fund." §410.6(f). But the agency did not seek to extend the same treatment to stock itself. So even assuming the validity of the regulation, it seems only to confirm our understanding.

To be sure, the regulation also lists "scrip and merchandise orders" as examples of qualifying mediums of exchange. §410.5. For argument's sake, too, we will accept that the word "scrip" can sometimes embrace stock. But even if "scrip" is *capable* of bearing this meaning, at the time the IRS promulgated the regulation in 1938 that was not its *ordinary* meaning. As even the government acknowledged before the Court of Appeals, "scrip" ordinarily meant "company-issued certificates" that employees could use in lieu of cash "to purchase merchandise at a company store." Brief for United States in Nos. 16–3300 etc. (CA7 2017), p. 37. This understanding fits perfectly as well with the whole phrase in which the term appears; both "scrip and merchandise orders" were frequently used at the time to purchase goods at company stores. See, *e.g.,* Webster's New International Dictionary 2249 (defining "scrip" as a "certificate . . . issued to circulate in lieu of government currency" or "by a corporation that pays wages partly in orders on a company store"); *Keokee Consol. Coke Co.* v. *Taylor,* 234 U. S. 224, 226 (1914) (company gave its employees "scrip . . . as an advance of monthly wages in payment for labor performed" that could be used to purchase merchandise at the company store); Gatch, Local Money in the United States During the Great Depression, 26 Essays in Economic & Bus. History 47–48 (2008).

What does the government have to say about all this?  It concedes that money remuneration often means remuneration in a commonly used medium of exchange.  But, it submits, the term can carry a much more expansive meaning too.  At least sometimes, the government says, "money" means any "property or possessions of any kind viewed as convertible into money or having value expressible in terms of money."  6 Oxford English Dictionary 603.  The dissent takes the same view.  See *post,* at 3 (opinion of BREYER, J.).  But while the term "money" *sometimes* might be used in this much more expansive sense, that isn't how the term was *ordinarily* used at the time of the Act's adoption (or is even today).  Baseball cards, vinyl records, snow globes, and fidget spinners all have "value expressible in terms of money."  Even that "priceless" Picasso has a price.  Really, almost *anything* can be reduced to a "value expressible in terms of money."  But in ordinary usage does "money" mean almost *everything*?

The government and the dissent supply no persuasive proof that Congress sought to invoke their idiosyncratic definition.  If Congress really thought everything is money, why did it take such pains to differentiate between money and stock in the Internal Revenue Code of 1939?  Why did it so carefully distinguish "money remuneration" in the Act and "all remuneration" in FICA?  Why did it include the word "money" to qualify "remuneration" if all remuneration counts as money?  And wouldn't the everything-is-money interpretation encompass railroad tickets, food, and lodging—exactly the sort of in-kind benefits we know the Act was written to *exclude*?  These questions they cannot answer.

To be sure, the government and dissent do seek to offer a different structural argument of their own.  They point to certain of the Act's tax exemptions, most notably the exemption for qualified stock options.  See 26 U. S. C. §3231(e)(12); *post,* at 6 (BREYER, J., dissenting).  Because

the Act *excludes* qualified stock options from taxation, the argument goes, to avoid superfluity it must *include* other sorts of stock options like the nonqualified stock options the railroads issued here. The problem, though, is that the exemption covers "*any* remuneration *on account of*" qualified stock options. §3231(e)(12) (emphasis added). And, as the government concedes, companies sometimes include money payments when qualified stock options are exercised (often to compensate for fractional shares due an employee). Brief for United States 30. As a result, the exemption does work under anyone's reading.

The government replies that Congress would not have bothered to write an exemption that does only this modest work. To have been worth the candle, Congress must have assumed that stock options would qualify as money remuneration without a specific exemption. But we will not join this guessing game. It is not our function "to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have" intended. *Henson*, 582 U. S*.,* at ___ (slip op., at 9). Besides, even if the railroads' interpretation of the statute threatens to leave one of many exemptions with little to do, that's hardly a reason to abandon it, for the government's and dissent's alternative promises a graver surplusage problem of its own. As it did in 1939, the Internal Revenue Code today repeatedly distinguishes between "stock" and "money." See, *e.g.*, §306(c)(2) (referring to a situation where "money had been distributed in lieu of . . . stock"). All these distinctions the government and dissent would simply obliterate.

Reaching further afield, the government and dissent point to a 1938 agency interpretation of another companion statute, the Railroad Retirement Act of 1937. See *post,* at 8–9 (BREYER, J., dissenting). Here, the Railroad Retirement Board suggested that the term "money remuneration" in the Railroad Retirement Act could sometimes

include in-kind benefits. Again we may assume the validity of the regulation because, even taken on its own terms, it only ends up confirming our interpretation. The Board indicated that in-kind benefits could count as money remuneration *only* if the employer and employee agreed to this treatment and to the dollar value of the benefit. 20 CFR §222.2 (1938). That same year, the Board made clear that stock was treated just like any other in-kind benefit under this rule: "stock cannot be considered as a 'form of money remuneration earned by an individual for services rendered'" unless part of an employee's "agreed compensation" and awarded "at a definite agreed value." Railroad Retirement Bd. Gen. Counsel Memorandum No. L–38–440, pp. 1–2 (1938). Later, the Board provided fuller explanation for its longstanding view, stating that these conditions are necessary because, unlike FICA, the Act does *not* cover "'remuneration . . . paid in any medium.'" Railroad Retirement Bd. Gen. Counsel Memorandum No. L–1986–82, p. 6 (1986). For decades, then, the Board has taken the view that nonmonetary remuneration is "not . . . included in compensation under the [Act] unless the employer and employee first agree to [its] dollar value . . . and then agree that this dollar value shall be part of the employee's compensation package." *Ibid.* None of these preconditions would be needed, of course, if the Act *automatically* taxed in-kind benefits as the government and dissent insist.

Finally, the government seeks *Chevron* deference for a more recent IRS interpretation treating "compensation" under the Act as having "the same meaning as the term wages in" FICA "except as specifically limited by the Railroad Retirement Tax Act." 26 CFR §31.3231(e)–1 (2017). But in light of all the textual and structural clues before us, we think it's clear enough that the term "money" excludes "stock," leaving no ambiguity for the agency to fill. See *Chevron U. S. A. Inc.* v. *Natural Resources*

*Defense Council, Inc.*, 467 U. S. 837, 843, n. 9 (1984). Nor does the regulation help the government even on its own terms. FICA's definition of wages—"*all* remuneration"—*is* "specifically limited by the Railroad Retirement Tax Act," which applies only to "*money* remuneration." So in the end all the regulation winds up saying is that everyone should look carefully at the relevant statutory texts. We agree, and that is what we have done.

The Court of Appeals in this case tried a different tack still, if over a dissent. The majority all but admitted that stock isn't money, but suggested it would make "good practical sense" for our statute to cover stock as well as money. 856 F. 3d, at 492. Meanwhile, Judge Manion dissented, countering that it's a judge's job only to apply, not revise or update, the terms of statutes. See *id.*, at 493. The Eighth Circuit made much the same point when it addressed the question. See *Union Pacific R. Co.* v. *United States*, 865 F. 3d 1045, 1048–1049 (2017). Judge Manion and the Eighth Circuit were right. Written laws are meant to be understood and lived by. If a fog of uncertainty surrounded them, if their meaning could shift with the latest judicial whim, the point of reducing them to writing would be lost. That is why it's a "fundamental canon of statutory construction" that words generally should be "interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute." *Perrin*, 444 U. S., at 42. Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences. Until it exercises that power, the people may rely on the original meaning of the written law.

This hardly leaves us, as the dissent worries, "trapped in a monetary time warp, forever limited to those forms of money commonly used in the 1930's." *Post,* at 3 (opinion of BREYER, J.). While every statute's *meaning* is fixed at

the time of enactment, new *applications* may arise in light of changes in the world.  So "money," as used in this statute, must always mean a "medium of exchange."  But what *qualifies* as a "medium of exchange" may depend on the facts of the day.  Take electronic transfers of paychecks.  Maybe they weren't common in 1937, but we do not doubt they would qualify today as "money remuneration" under the statute's original public meaning.  The problem with the government's and the dissent's position today is not that stock and stock options weren't common in 1937, but that they were not then—and are not now—recognized as mediums of exchange.

The judgment of the Seventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–530

_____

## WISCONSIN CENTRAL LTD., ET AL., PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 21, 2018]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

The case before us concerns taxable "compensation" under the Railroad Retirement Tax Act. The statute defines the statutory word "compensation" as including "any form of money remuneration paid to an individual for services rendered." 26 U. S. C. §3231(e)(1). Does that phrase include stock options paid to railroad employees "for services rendered"? *Ibid.* In my view, the language itself is ambiguous but other traditional tools of statutory interpretation point to the answer, "yes." Consequently, the Government's interpretation of the language—which it has followed consistently since the inception of the statute—is lawful. I therefore dissent.

I

A stock option consists of a right to buy a specified amount of stock at a specific price. If that price is lower than the current market price of the stock, a holder of the option can exercise the option, buy the stock at the option price, and keep the stock, or he can buy the stock, sell it at the higher market price, and pocket the difference. Companies often compensate their employees in part by paying them with stock options, hoping that by doing so they will provide an incentive for their employees to work harder to

increase the value of the company.

Employees at petitioners' companies who receive and exercise a stock option may keep the stock they buy as long as they wish. But they also have another choice called the "cashless exercise" method. App. 42. That method permits an employee to check a box on a form, thereby asking the company's financial agents to buy the stock (at the option price) and then immediately sell the stock (at the higher market price) with the proceeds deposited into the employee's bank account—just like a deposited paycheck. *Ibid.* About half (around 49%) of petitioners' employees used this method (or a variation of it) during the relevant time period. Separate App. of Plaintiffs-Appellants in No. 16–3300 (CA7), p. 45. The Solicitor General tells us that many more employees at other railroads also use this "cashless exercise" method—93% in the case of CSX, 90% to 95% in the case of BNSF. Brief for United States 20 (citing *CSX Corp.* v. *United States*, 2017 WL 2800181, \*2 (MD Fla., May 2, 2017), and *BNSF R. Co.* v. *United States*, 775 F. 3d 743, 747 (CA5 2015)).

## II

### A

Does a stock option received by an employee (along with, say, a paycheck) count as a "form"—some form, "any form"—of "money remuneration?" The railroads, as the majority notes, believe they can find the answer to this question by engaging in (and winning) a war of 1930's dictionaries. I am less sanguine. True, some of those dictionaries say that "money" primarily refers to currency or promissory documents used as "a medium of exchange." See *ante,* at 2–3. But even this definition has its ambiguities. A railroad employee cannot use her paycheck as a "medium of exchange." She cannot hand it over to a cashier at the grocery store; she must first deposit it. The same is true of stock, which must be converted into cash

and deposited in the employee's account before she can enjoy its monetary value. Moreover, what we view as money has changed over time. Cowrie shells once were such a medium but no longer are, see J. Weatherford, The History of Money 24 (1997); our currency originally included gold coins and bullion, but, after 1934, gold could not be used as a medium of exchange, see Gold Reserve Act of 1934, ch. 6, §2, 48 Stat. 337; perhaps one day employees will be paid in Bitcoin or some other type of cryptocurrency, see F. Martin, Money: The Unauthorized Biography— From Coinage to Cryptocurrencies 275–278 (1st Vintage Books ed. 2015). Nothing in the statute suggests the meaning of this provision should be trapped in a monetary time warp, forever limited to those forms of money commonly used in the 1930's.

Regardless, the formal "medium of exchange" definition is not the only dictionary definition of "money," now or then. The Oxford English Dictionary, for example, included in its definition "property or possessions of any kind viewed as convertible into money," 6 Oxford English Dictionary 603 (1st ed. 1933); Black's Law Dictionary said that money was the representative of "everything that can be transferred in commerce," Black's Law Dictionary 1200 (3d ed. 1933); and the New Century Dictionary defined money as "property considered with reference to its pecuniary value," 1 New Century Dictionary of the English Language 1083 (1933). Although the majority brushes these definitions aside as contrary to the term's "ordinary usage," *ante,* at 6, a broader understanding of money is perfectly intuitive—particularly in the context of compensation. Indeed, many of the country's top executives are compensated in both cash and stock or stock options. Often, as is the case with the president of petitioners' parent company, executives' stock-based compensation far exceeds their cash salary. Brief for United States 6–7. But if you were to ask (on, say, a mortgage application)

how much money one of those executives made last year, it would make no sense to leave the stock and stock options out of the calculation.

So, where does this duel of definitions lead us? Some seem too narrow; some seem too broad; some seem indeterminate. The result is ambiguity. Were it up to me to choose based only on what I have discussed so far, I would say that a stock option is a "form of money remuneration." Why? Because for many employees it almost immediately takes the form of an increased bank balance, because it strongly resembles a paycheck in this respect, and because the statute refers to "*any form*" of money remuneration. A paycheck is not money, but it is a means of remunerating employees monetarily. The same can be said of stock options.

### B

Fortunately, we have yet more tools in our interpretive arsenal, namely, all the "traditional tools of statutory construction." *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 446 (1987). Let us look to purpose. What could Congress' purpose have been when it used the word "money"? The most obvious purpose would be to exclude certain in-kind benefits that are nonmonetary—either because they are nontransferrable or otherwise difficult to value. When Congress enacted the statute, it was common for railroad workers to receive free transportation for life. Taxation of Interstate Carriers and Employees: Hearings on H. R. 8652 before the House Committee on Ways and Means, 74th Cong., 1st Sess., 6 (1935). Unlike stock options, it would have been difficult to value this benefit. And even very broad definitions of "money" would seem to exclude it. *E.g.,* 6 Oxford English Dictionary, at 603.

Another interpretive tool, the statute's history, tends to confirm this view of the statutory purpose (and further supports inclusion of stock options for that reason). An

earlier version of the Act explicitly excluded from taxation any "free transportation," along with such in-kind benefits as "board, rents, housing, [and] lodging" provided that their value was less than $10 per month (about $185 per month today). S. 2862, 74th Cong., 1st Sess., §1(e), p. 3 (1935). In other words, they were incidental benefits that were particularly difficult to value. Congress later dropped these specific provisions from the bill on the ground that they were "superfluous." S. Rep. No. 697, 75th Cong., 1st Sess., 8 (1937).

Excluding stock options from taxation under the statute would not further this basic purpose and would be inconsistent with this aspect of the statute's history, for stock options are financial instruments. They can readily be bought and sold, they are not benefits in kind (*i.e.,* they have no value to employees other than their financial value), and—compared to, say, meals or spontaneous train trips—they are not particularly difficult to value.

Nor is it easy to see what purpose the majority's interpretation would serve. Congress designed the Act to provide a financially stable, self-sustaining system of retirement benefits for railroad employees. See S. Rep. No. 6, 83d Cong., 1st Sess., pt. 1, pp. 64–65 (1953); see also 2 Staff of the House Committee on Interstate and Foreign Commerce and the Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess., 12–15 (Jt. Comm. Print 1972) (describing financial difficulties facing the private railroad pension programs that Congress sought to replace). Nevertheless, petitioners speculate that Congress intended to limit the Act's tax base to employees' "regular pay" because that more closely resembled the way private pensions in the railroad industry calculated a retiree's annuity. Brief for Petitioners 8. But the Act taxes not simply monthly paychecks but also bonuses, commissions, and contributions to an employee's retirement account (like a 401(k)), see §§3231(e)(1), (8)—none of which were

customarily considered in railroad pension calculations. Why distinguish stock options from these other forms of money remuneration—particularly when almost half the employees who participated in petitioners' stock option plan (and nearly all such employees at other railroads) have the option's value paid directly into their bank accounts in cash? See *supra,* at 2.

The statute's structure as later amended offers further support. That is because a later amendment expressly *excluded* from taxation certain stock options, namely, "[q]ualified stock options," see §3231(e)(12), which tax law treats more favorably (and which are also excluded from the Social Security tax base, §3121(a)(22)). What need would there be to exclude expressly a subset of stock options if the statute already excluded *all* stock options from its coverage? The same is true of certain in-kind benefits, such as life-insurance premiums. See §3231(e)(1)(i). Congress has more recently amended the statute to exclude expressly other hard-to-value fringe benefits. See §3231(e)(5). Again what need would there be to do so if all noncash benefits, including stock options, were already excluded?

C

There are, of course, counterarguments and other considerations, which the majority sets forth in its opinion. The majority asserts, for example, that Congress must have intended the Act to be read more narrowly because, shortly after enacting the statutory language at issue in this dispute, Congress enacted the Federal Insurance Contributions Act (FICA), which uses different language to establish its tax base. The Railroad Retirement Tax Act defines "compensation" in part as "any form of money remuneration," §3231(e)(1) while FICA defines "wages" as including the "cash value of all remuneration (including benefits) paid in any medium other than cash," §3121(a).

But there is no canon of interpretation forbidding Congress to use different words in different statutes to mean somewhat the same thing. See *Kirtsaeng* v. *John Wiley & Sons, Inc.*, 568 U. S. 519, 540 (2013). And the meaning of the statutory terms as I read them are not identical, given FICA's definition of "wages" would include those types of noncash benefits that the Railroad Retirement Tax Act exempts from taxation. See *supra,* at 4–5.

At most, this conflicting statutory language leaves the meaning of "money remuneration" unclear. In these circumstances, I would give weight to the interpretation of the Government agency that Congress charged with administering the statute. "Where a statute leaves a 'gap' or is 'ambiguous' we typically interpret it as granting the agency leeway to enact rules that are reasonable in light of the text, nature, and purpose of the statute." *Cuozzo Speed Technologies, LLC* v. *Lee*, 579 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 13) (citing *United States* v. *Mead Corp.*, 533 U. S. 218, 229 (2001); *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984)). And even outside that framework, I would find the agency's views here particularly persuasive. *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 139–140 (1944). The interpretation was made contemporaneously with the enactment of the statute itself, *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 315 (1933), and the Government has not since interpreted the statute in a way that directly contradicts that contemporaneous interpretation, see, *e.g.*, *Cardoza-Fonseca*, 480 U. S., at 446, n. 30; *Watt* v. *Alaska*, 451 U. S. 259, 272–273 (1981). Congress, over a period of nearly 90 years, has never revised or repealed the agencies' interpretation, despite modifying other provisions in the statute, which "'is persuasive evidence that the interpretation is the one intended by Congress.'" *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 846 (1986) (quoting *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267,

274–275 (1974)).  Nor did the railroad industry object to the taxation of stock options based on the Government's interpretation until recent years.  See, *e.g., Union Pacific R. Co.* v. *United States*, 2016 U. S. Dist. LEXIS 86023, *4–*5 (D Neb., July 1, 2016) (noting that Union Pacific began issuing stock options in tax year 1981 and paid railroad retirement taxes on them for decades, challenging the Government's interpretation only in 2014).

What is that interpretation? Shortly after the Act was passed, the Department of Treasury issued a regulation defining the term "compensation" in the Act as reaching both "all remuneration in money, or in something which may be used in lieu of money (scrip and merchandise orders, for example)."  26 CFR §410.5 (1938).  In the 1930's, "scrip" could refer to "[c]ertificates of ownership, either absolute or conditional, of shares in a public company, corporate profits, etc."  Black's Law Dictionary, at 1588; C. Alsager, Dictionary of Business Terms 321 (1932) ("A certificate which represents fractions of shares of stock"); 3 F. Stroud, Judicial Dictionary 1802 (2d ed. 1903) ("a [c]ertificate, transferable by delivery, entitling its holder to become a Shareholder or Bondholder in respect of the shares or bonds therein mentioned").  The majority, though clearly fond of 1930's-era dictionaries, rejects these definitions because, in its view, they do not reflect the term's "*ordinary* meaning."  *Ante,* at 5.  But the majority has no basis for this assertion.  Contra *Eisner* v. *Macomber*, 252 U. S. 189, 227 (1920) (Brandeis, J., dissenting) (referring to "bonds, scrip or stock" as similar instruments of corporate finance).

The Treasury Department was not alone in interpreting the term "money remuneration" more broadly.  In 1938 the Railroad Retirement Board's regulations treated the term "any form of money remuneration" as including "a commodity, service, or privilege" that had an "agreed upon" value.  20 CFR §222.2; see also 20 CFR §211.2

(2018) (current version).  At least one contemporaneous legal opinion from the Board's general counsel specifically concluded that stock received by "employees as a part of their agreed compensation for services actually rendered and at a definite agreed value" qualified as a "form of money remuneration."  Railroad Retirement Bd. Gen. Counsel Memorandum No. L–1938–440, p. 2 (Apr. 22, 1938).  And in a more recent opinion, the Board's general counsel stated that nonqualified stock options (the type of stock option at issue in this dispute) are taxable under the Act.  Railroad Retirement Bd. Gen. Counsel Memorandum No. L–2005–25, p. 6 (Dec. 2, 2005).

The majority plucks from the Act's long administrative history a 1986 Board legal opinion stating that an in-kind benefit should not be treated as compensation "'unless the employer and employee first agree to [its] dollar value . . . and then agree that this dollar value shall be part of the employee's compensation package.'"  *Ante,* at 8 (quoting Railroad Retirement Bd. Gen. Counsel Memorandum No. L–1986–82, p. 6 (June 3, 1986)).  But the majority neglects to share that the deputy general counsel who wrote that legal opinion was not discussing stock or stock options, but rather was discussing a "fringe benefit"—specifically free rail passes employers purchased on behalf of their employees so they could ride on other carriers' trains.  *Ibid.* As I explained above, *supra,* at 4–5, such non-transferrable travel benefits were difficult to value and thus were excluded from the Act's definition of money remuneration.  (Though the Board's willingness to treat at least *some* fringe benefits as a "form of money remuneration" demonstrates that the Board took a more flexible view of the term—a view that is contrary to the rigid dictionary definition of "money" the majority prefers, which excludes all forms of in-kind benefits.  See *ante,* at 2–3.)

A stock option, unlike free travel benefits, has a readily

discernible value: namely, the difference between the option price and the market price when the employee exercises the option. For those employees who use the "cashless exercise" method, that difference is the amount that is deposited into their account as cash (minus fees). See *supra,* at 2. No one disputes that this is the value of the option when it is exercised. See Stipulations of Fact in No. 14–cv–10243, Exh. 13 (ND Ill.), p. CN168 (describing the taxable benefit from exercising a stock option). And no one disputes that granting employees stock options is a form of remuneration. See *ante,* at 3 (acknowledging that "'remuneration' can encompass any kind of reward or compensation"). The 1986 legal opinion on rail passes the majority invokes simply has no bearing on the tax treatment of stock options in this case.

More recently, the Treasury has issued a regulation stating that the Railroad Retirement Tax Act's term "compensation" (which, the reader will recall, the Act defines as "any form of money remuneration") has the same meaning as the term "wages" in FICA "'*except as specifically limited by*'" *the Railroad Retirement Tax Act or by regulation.* Brief for Petitioners 47. Petitioners do not dispute that FICA long has counted stock options as compensation. See *id.,* at 39–47. Neither the statute's text nor any regulation limits us from doing the same for the Railroad Retirement Tax Act. If anything, the earlier Treasury and Board regulations and opinions make clear that, in the Treasury Department's view, the Act does *not* "specifically limit" the application of its terms by excluding stock options from its coverage.

The Treasury Department's interpretation is a reasonable one. For one thing, it creates greater uniformity between the Railroad Retirement Tax Act's pension-like taxing system and the Social Security system governed by FICA. To seek administrative uniformity is (other things being equal) a reasonable objective given the similarity of

purpose and methods the two Acts embody. And subsequent amendments to the Railroad Retirement Tax Act (which have generally mirrored provisions in FICA) demonstrate that Congress intended these tax regimes to be treated the same. See Update of Railroad Retirement Tax Act Regulations, 59 Fed. Reg. 66188 (1994) (observing that Congress has taken steps to "confor[m] the structure of the [Railroad Retirement Tax Act] to parallel that of the FICA"); compare §§3231(e)(1), (9) with §§3121(a)(2)(C), (a)(19). For another, it helps to avoid the unfairness that would arise out of treating differently two individuals (who received roughly the same amount of money in their bank accounts) simply because one received a paycheck while the other received proceeds from selling company stock.

Here, in respect to stock options, the Act's language has a degree of ambiguity. But the statute's purpose, along with its amendments, argues in favor of including stock options. The Government has so interpreted the statute for decades, and Congress has never suggested it held a contrary view, despite making other statutory changes. In these circumstances, I believe the Government has the stronger argument. I would read the statutory phrase as including stock options. And, with respect, I dissent from the majority's contrary view.