# Supreme Court of Texas

No. 20-0393

James Fredrick Miles,

*Petitioner*,

v.

Texas Central Railroad & Infrastructure, Inc. and
Integrated Texas Logistics, Inc.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

JUSTICE HUDDLE, joined by Justice Devine and Justice Blacklock, dissenting.

Today the Court holds that two for-profit corporations wield the power of eminent domain, allowing them to forcibly take thousands of parcels of privately owned Texas land located along the proposed route of a high-speed train they hope—someday—to build and operate.[1] To justify this mass-scale exercise of an extraordinary sovereign power by

---

[1] I refer to these two corporate entities, Texas Central Railroad & Infrastructure, Inc. and Integrated Texas Logistics, Inc., collectively as "Texas Central."

private parties, the Court resurrects a 115-year-old statute governing "interurban electric railways"—sisters to the trolley car—that were popular in the late nineteenth century but largely disappeared in the 1930s with the rise of the private automobile.

No one questions that the statute, Transportation Code Section 131.012, granted eminent-domain authority to facilitate construction of small electric railways for ferrying Texans short distances between adjacent towns and up and down Main Streets alongside horse-drawn carriages. But it blinks reality to conclude, as the Court does, that the same trolley-car statute confers eminent-domain power on private entities aspiring to build—in 2022—a massive $30 billion infrastructure project capable of supporting an elevated, 672-foot-long high-speed train as it traverses hundreds of miles and thousands of privately owned parcels between Houston and Dallas.

There are countless differences between the two modes of transportation. The most important, which merits little mention by the Court, is their radically different land-use requirements. The scale of infrastructure required and amount of property imperiled by the proposed high-speed train project are orders of magnitude larger—Texas Central itself boasts the project will require nearly three times the amount of concrete used to build Hoover Dam.[2] And the extent of impairment to land in and surrounding the path of the proposed train dwarfs the harm early-1900s electric rail posed. These differences matter, of course, because fundamental property rights of many

_____

[2] *Infrastructure*, TEXAS CENTRAL, https://www.texascentral.com/infrastructure/ (last visited June 10, 2022).

2

hundreds of Texans in and near the train's planned path hang in the balance.

Since time immemorial, the law has ascribed to property rights a unique status. This Court has described them as "fundamental, natural, inherent, inalienable, not derived from the legislature and as preexisting even constitutions." *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977). And we have thus accorded property rights the utmost protection. It follows that our precedents demand rigorous judicial scrutiny when construing eminent-domain statutes, particularly those vesting the power in private actors. Strict compliance with all statutory requirements is required. *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline–Tex., LLC*, 363 S.W.3d 192, 198 (Tex. 2012). And in instances of doubt as to the scope of the power, the statute granting such power is "strictly construed in favor of the landowner" and against the would-be condemnor. *Id.* (quoting *Coastal States Gas Producing Co. v. Pate*, 309 S.W.2d 828, 831 (Tex. 1958)).

The Court today abandons these longstanding principles. By reading statutory terms in isolation and ignoring context, the Court concludes that the proposed high-speed rail system plainly falls within Section 131.012's scope. Unlike the Court, I harbor serious doubt that it does. I would resolve that doubt in the landowner's favor, as our precedents require. Because the Court does otherwise, I respectfully dissent.

## I. Eminent-domain statutes are strictly construed to protect fundamental property rights.

"Private property ownership pre-existed the Republic of Texas and the constitutions of both the United States and Texas." *Severance*

3

*v. Patterson*, 370 S.W.3d 705, 709 (Tex. 2012). "Both constitutions protect these rights in private property as essential and fundamental rights of the individual in a free society." *Id.* Indeed, preservation of property rights is "one of the most important purposes of government." *Denbury*, 363 S.W.3d at 204 (quoting *Eggemeyer*, 554 S.W.2d at 140); *see also Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 804 (Tex. 2016) ("This Court has repeatedly, recently, and unanimously recognized that strong judicial protection for individual property rights is essential to 'freedom itself.'" (quoting *Denbury*, 363 S.W.3d at 204)).

Eminent domain—the power to take private property for public use without the owner's consent—cuts against our deep veneration for individual property rights. And it is an inherently *sovereign* power. *Tex. Highway Dep't v. Weber*, 219 S.W.2d 70, 72 (Tex. 1949) (describing the power of eminent domain as "an inherent attribute of sovereignty" that "exists independent of constitutional provision" and is "inherent in organized society itself"). Because those who possess it wield the power of the State, the delegation of eminent-domain authority to private parties upsets our ordinary structure of government and has the potential to create a host of "troubling constitutional issues." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 874 (Tex. 2000). This is because private actors who wield the power of eminent domain may have incentives to act contrary to the public interest and are not bound by the systems of accountability to which public officials are subjected. *Id.*

Given the weighty interests at play, this Court has rightly imposed special standards in this context. "In construing statutes that delegate the power of eminent domain, the language used by the

4

legislature may be accorded a full meaning so as to carry out the manifest purpose and intention of the statute, however, the application of the law will be restricted *to only those cases clearly falling within its terms*." *Burch v. City of San Antonio*, 518 S.W.2d 540, 545 (Tex. 1975) (emphasis added). In short, because the exercise of eminent-domain authority—particularly by a private party—is in derogation of the rights of the citizen, "statutes conferring such power are strictly construed in favor of the landowner and against those corporations . . . vested therewith." *Id.*

## II. Texas Central does not "clearly fall within" Section 131.012's scope.

The Court reasons that Texas Central is a corporation vested with eminent-domain authority under Section 131.012 because its proposed project is an "electric railway" and will travel between Dallas and Houston. *Ante* at 11. To be sure, Texas Central will literally employ "electric railway" and will do so "between municipalities." But our analysis cannot end there. Our well-established rules of construction forbid plucking terms out of a statute for examination in a vacuum; they favor—indeed, require—analysis of the statute as a whole and in context. *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 326 (Tex. 2017) ("[O]ur objective is not to take definitions and mechanically tack them together[;] . . . rather, we consider the context and framework of the entire statute and meld its words into a cohesive reflection of legislative intent."); *see also TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011); *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 90 (Tex. 2001).

5

The Court ignores the historical context in which the Legislature used its chosen words and the surrounding statutory provisions that undercut the Court's conclusion. I would instead apply the "fundamental canon of statutory construction" that words should be interpreted according to their ordinary meaning when the statute was enacted. *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (quoting *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018)). This analysis requires evaluation of both "evidence of the term's meaning at the time of the [law's] adoption" and "neighboring" statutory text. *Id.* at 539–40.

The electric interurban railway played a major but short-lived role in the development of intercity passenger transport.[3] This mode of transportation achieved broad success in the first decade of the 1900s.[4] But the eventual adoption of the automobile led to the technology's demise.[5] By the mid-1930s, the interurban rail industry was "virtually annihilated," and within three decades, "no trace of it remained in its original form."[6]

"Interurbans" (as they were colloquially called) were an evolution of the electric streetcar or trolley that expanded from urban service into

---

[3] GEORGE W. HILTON & JOHN F. DUE, THE ELECTRIC INTERURBAN RAILWAYS IN AMERICA vii (1960); *see* Robert A. Rieder, *Electric Interurban Railways*, HANDBOOK OF TEXAS ONLINE, https://www.tshaonline.org/handbook/entries/electric-interurban-railways (last visited June 10, 2022).

[4] HILTON & DUE, *supra* note 3, at 3.

[5] *Id.*

[6] *Id.*

6

short-route rural and intercity operation.[7]  Much less expensive to build and operate than ordinary railroads, interurbans could "penetrate an area with inadequate or no rail service" and stop "virtually anywhere."[8] Interurbans possessed "many of the characteristics of the street railway when operated within a municipality": they traveled entirely "upon the streets, stop[ped] at the street corners for the accommodation of passengers and its road-bed [was] constructed so as to conform to the grade of the street and the rails laid so as not to materially interfere with the traffic thereon."[9]

The ability of interurbans to operate in a manner like a single-car trolley lumbering down Main Street is expressly contemplated by the statutory scheme originally enacted in 1907.  Act effective Mar. 9, 1907, 30th Leg., R.S., ch. 15, 1907 Tex. Gen. Laws 23, 23–26 (current version at TEX. TRANSP. CODE §§ 131.011–.017).  It envisions the construction of a railway "on or across" a municipality's "street, alley, [or] square."  TEX. TRANSP. CODE § 131.014(d).  Moreover, an interurban electric railway company may condemn easements and rights-of-way "along and on the track of an electric street railway . . . on any public street or alley."  *Id.* § 131.015(a).  If the company exercises its right to condemn street rail, however, it must complete construction of the road "from one

---

[7] *Id.* at 7.

[8] H. Roger Grant, *"Interurbans Are the Wave of the Future": Electric Railway Promotion in Texas*, 84 SW. HIST. Q. 29, 29–30 (July 1980).

[9] Clarence A. Beutel, *The Interurban Electric Railway as a Modern Development of the Use of the Streets and Highways or as an Additional Burden*, 2 VA. L. REG. 17, 17–18 (1916).

7

municipality to another within 12 months." *Id.* § 131.016. In short, the Legislature undoubtedly contemplated transportation systems like these smaller electric railways able to traverse streets and alleys alongside their streetcar siblings when it crafted this law.



Texas Central's high-speed rail system is a world apart from this—in design, scale, and intrusiveness.[11] It will feature trainsets 672 feet long capable of carrying 400 passengers at 205 miles per hour.[12] It requires rights-of-way of 328 feet (on average) and 100 feet (at minimum) to accommodate the track, overhead catenary system, access road, and security fencing.[13] More than half of the 240-mile track will

---

[10] Rieder, *supra* note 3 (depicting Sherman–Dallas Interurban Railway); Michael Barnes, *The rise and fall of Austin streetcars*, AUSTIN AMERICAN-STATESMAN (Feb. 4, 2019) (depicting Austin's electric street-rail system), https://www.statesman.com/story/news/history/2019/02/04/history-center-exhibit-tracks-rise-and-fall-of-austin-streetcars/6111911007/.

[11] *See* U.S. DEP'T OF TRANSP., FED. R.R. ADMIN., DALLAS TO HOUSTON HIGH-SPEED RAIL: FINAL ENVIRONMENTAL IMPACT STATEMENT (May 2020) ES-1 to -2.

[12] *Id.* at ES-4.

[13] *Id.*

be built on a bridge-like structure called a viaduct.[14]  Where that's not possible, it will be on elevated embankments or at grade surrounded by fencing.[15]  The railway will operate on a "closed system" not interconnected with any other railroad and separated from any existing infrastructure.[16]

Against this context, and examining the statute as a whole, I cannot conclude that Texas Central's proposed use of eminent-domain authority "clearly fall[s] within [Section 131.012's] terms."  *See Burch,* 518 S.W.2d at 545.  Recognizing the chasm between Texas Central's project and what the Legislature actually envisioned when it enacted the statute in 1907, the Court makes several analytical leaps—all of which are in tension with ordinary principles of statutory interpretation.

---



[14]  *Id.*  This is a conceptual rendering of Texas Central's high-speed train travelling on a viaduct.  *Low Impact Design*, TEXAS CENTRAL, https://www. texascentral.com/low-impact-design/ (last visited June 10, 2022).

[15] *See* FINAL ENVIRONMENTAL IMPACT STATEMENT, at ES-4, App. F (Set 1) at 51, 63.

[16] *Id.* at ES-3 to -4.

*First*, the Court dismisses the ordinary, common meaning of "interurban electric railway company," relying solely on Chapter 131's definition as a corporation chartered "to conduct and operate an electric railway between two municipalities in this state." *Ante* at 15 (quoting TEX. TRANSP. CODE § 131.011). But we have instructed that "[s]tatutory definitions must be interpreted in light of the ordinary meaning of the word being defined." *In re Ford Motor Co.*, 442 S.W.3d 265, 271 (Tex. 2014); *see Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 135 (Tex. 2019) ("Even when a statute provides its own definition or explanation of a term . . . in applying that definition, we should not ignore altogether the common meaning of the words being defined, unless the statutory text compels otherwise.").

By divorcing the defined term from its common usage at the time of the statute's adoption, the Court misses "the most significant element of the definition's context." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 232 (2012). And in doing so, the Court fails to recognize the implausibility of its reading of Chapter 131—which bestows eminent-domain authority on Texas Central as an "interurban electric railway company" even though Texas Central is nothing like what the drafting Legislature would have understood an "interurban electric railway company" to mean (i.e., a company operating the distinct but extinct trolley-like technology discussed above).

*Second*, the Court emphasizes that the statute appears to vest eminent-domain power in a broader category of corporations operating "lines of electric railway" and makes no mention of interurbans at all.

10

*Ante* at 15 (quoting TEX. TRANSP. CODE § 131.012). But myopic focus on the phrase "electric railway" is improper. For one, a later provision in the same subchapter includes the reference to interurbans the Court claims is absent from the statute. In particular, Section 131.015 refers to an "interurban electric railway company's power of eminent domain under this subchapter," reflecting the link between interurbans and eminent-domain authority that the Court ignores. TEX. TRANSP. CODE § 131.015(a).

In addition, the Court's keen focus on just two of the words in the statute—"electric" and "railway"—improperly expands the statute's scope. By focusing on these two words and evaluating them out of context, it morphs the phrase to mean "any rail technology powered by electricity." That is one literal, grammatically permissible reading of this text, but it certainly was not what the Legislature understood "electric railway" to mean when it enacted the statute in 1907.[17] *See ante* at 16 (conceding high-speed rail system in dispute here "was unimaginable when the Legislature passed the 1907 statute at issue").

I would not construe the phrase "electric railway" broadly to apply to contexts unimaginable to the statute's drafters. After all, the meaning of a statute that governs is the ordinary meaning "commonly understood at the time of enactment." *Thompson v. Tex. Dep't of*

---

[17] *See, e.g.*, DELOS F. WILCOX, ANALYSIS OF THE ELECTRIC RAILWAY PROBLEM 4 (1921) ("While it is true that the electric railways have overflowed municipal boundaries and now include a network of interurban lines in many portions of the country, it still remains a fact that the electric railway as thus far developed is primarily an urban street railway with its principal function the transportation of passengers within the limits of municipalities.").

*Licensing & Regul.*, 455 S.W.3d 569, 570 (Tex. 2014); *see New Prime*, 139 S. Ct. at 539. While the statutory-interpretation exercise might be a closer call in a case in which our ordinary statutory-interpretation principles govern, this is not such a case. As our precedents make clear, special statutory-interpretation principles govern eminent-domain statutes. *Burch*, 518 S.W.2d at 545 (noting statutes conferring eminent-domain power are "strictly construed in favor of the landowner" and restricting application of eminent-domain statute to "only those cases clearly falling within its terms"); *see Pate*, 309 S.W.2d at 831 (limiting operation of statute conferring eminent-domain authority to "cases which plainly fall within its terms as well as its spirit and purpose"). Those standards plainly are not met by applying Section 131.012 to contexts far beyond what the Legislature could possibly have contemplated.

What's more, the electric railway at issue here—a massive and modern high-speed rail system—is incompatible with several neighboring statutory provisions. Texas Central's project could not navigate municipal streets or alleys, as the statute envisions. *See* TEX. TRANSP. CODE § 131.014(d). Its immense speed and specialized infrastructure prevent it from sharing tracks with an "electric street railway." *Id.* § 131.015(a). Even if it could share on-street tracks, the project's sheer scale would prevent its completion within twelve months. *See id.* § 131.016. Of course, not all a statute's provisions are invoked in every one of its applications. Yet considering the whole of Chapter 131 together makes plain that the statute contemplates smaller, localized electric railways, like the "interurbans" in vogue at the time of its

12

adoption, and not a vastly larger high-speed railway that the statute simply does not accommodate. At a minimum, considering these conflicting provisions, I cannot conclude that the statute "clearly" applies or that the Legislature's "manifest purpose" in enacting it was to provide eminent-domain power to major high-speed rail systems. *Burch*, 518 S.W.2d at 545.

*Third*, recognizing some incompatibility between high-speed rail and the interurban contemplated by the statute, the Court asserts that the law can "embrace later-developed technologies." *Ante* at 16. To do so, the Court draws the wrong lesson from *Kyllo v. United States*, 533 U.S. 27 (2001). The Supreme Court held in that case that a police officer's use of a thermal imager to surveil a home constituted an unlawful search. *Id.* at 40. That decision stands for the proposition that the fixed nature of the Constitution "assures preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Id.* at 34. Put simply, *Kyllo* instructs that mere advances in technology cannot justify erosion of our most fundamental rights. *Id.* at 35–36.

The Court's conclusion here has the effect *Kyllo* sought to guard against. It allows *expansion* of a private delegation of eminent-domain authority (and attendant usurpation of private property rights) based merely on technological advancement. The massive project Texas Central proposes positively dwarfs the technology contemplated by the statute. And it entails a level of intrusion on private property that was not foreseen, and certainly not endorsed, by the Legislature in 1907. The Court wrongly endorses the notion that technology, merely through

13

incremental advancement, chips away at Texans' fundamental property rights.

The Court relies heavily on *San Antonio & A. P. Ry. Co. v. Southwestern Telegraph & Telephone Co.*, 55 S.W. 117 (Tex. 1900). *Ante* at 16. There, we held that a statute granting condemnation power to "telegraph" companies applied equally to "telephone" companies. *Sw. Tel.*, 55 S.W. at 119. But the case should not be read to support the notion that eminent-domain power expands as technology advances, absent legislative action. As we later explained, crucial to that decision were "later statutory enactments that reflected the Legislature's intent to treat both [telegraph and telephone companies] the same." *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 705 (Tex. 2002). The case-turning inquiry was not "the intent of the legislature when [the relevant provisions] were first enacted" but "legislative intent" at the time of later amendments to the broader statutory scheme, which treated telephone and telegraph companies interchangeably. *Sw. Tel.*, 55 S.W. at 118. Conferring the same eminent-domain powers to telephone companies thus "harmonize[d] every provision of the law," whereas denying such authority would have led to "absurd" results. *Id.* at 119. Furthermore, our conclusion was bolstered by numerous cases holding that "[t]he term 'telegraph' . . . include[s] telephones." *Id.* at 117 (collecting cases).

Nothing of the sort supports the Court's expansion of eminent-domain power today. There is no longstanding caselaw equating high-speed rail with interurbans. And no amendments to Chapter 131 reflect legislative intent that Section 131.012 embrace high-speed rail projects, which are addressed in entirely different chapters of the Transportation

14

Code. *See, e.g.*, TEX. TRANSP. CODE §§ 111.103(a), 112.201–.205, 199.003(a). Indeed, the last time the Legislature considered high-speed rail in Texas, it created a new state agency to award a franchise to a private entity and then exercise eminent-domain power on behalf of the private entity. Texas High-Speed Rail Act, 71st Leg., R.S., ch. 1104, § 1, secs. 2(b), 6(b)(3), (9), 12, 1989 Tex. Gen. Laws 4564, 4564–75 (repealed 1995). That now-repealed statute's grant of eminent-domain authority would have been unnecessary if any private entity could simply charter as an interurban and enjoy the same powers.[18]

For these reasons, I cannot join the Court's opinion and likewise am at odds with the concurrence of JUSTICE YOUNG. There is a great deal of common ground between my dissent and his concurrence, which rightly pays heed to the judiciary's role in protecting property rights and the special scrutiny required when interpreting delegations of eminent-domain power. And I remain hopeful that we, along with the rest of the

---

[18] Other intervening changes in the law further cut against the Court's conclusion. In the wake of *Kelo v. City of New London*, 545 U.S. 469 (2005), Texas, like many other states, enacted eminent-domain reforms. Marc Mihaly & Turner Smith, Kelo*'s Trail: A Survey of State and Federal Legislative and Judicial Activity Five Years Later*, 38 ECOLOGY L.Q. 703, 717–19 (2011). In 2009, Texans adopted a constitutional amendment requiring "a two-thirds vote of each house of the legislature to grant the power of eminent domain to an entity (public or private)." *Id.* at 718 (citing H.R.J. Res. 14, 81st Leg., R.S., 2009 Tex. Gen. Laws 5655); *see* TEX. CONST. art. I, § 17(c). This provision ensures that any new delegation of the State's eminent-domain power occurs only after careful deliberation and widespread consensus. And if the huge number of amicus briefs is any indication—the Court has received more than 40 briefs and letters from amici in this case—Texas Central's bullet train is the sort of controversial project where this provision's protections and requirements should have significant purchase. But today, the Court permits an end-run around the democratic deliberation our Constitution now requires.

Court, will be in agreement in future cases involving different statutes. But the concurrence's correct recitation of legal principles and my optimism for future agreement mean nothing for the hundreds upon hundreds of landowners who will be subjected to the "massive" "intrusion into private-property interests that is required to build the project at issue here." *Ante* at 6 (Young, J., concurring). Given the "exacting level of scrutiny" that JUSTICE YOUNG acknowledges must be applied here, *id.* at 4, I am unable to endorse the stretching of this delegation of authority to reach a meaningfully more intrusive infrastructure project that nobody had in mind when they enacted that text and that is wholly incompatible with multiple provisions of the statutory scheme.

### III. Texas Central also does not qualify as a "railroad company."

The court of appeals also held that Texas Central enjoys eminent-domain powers granted to "railroad companies." 635 S.W.3d 684, 692 (Tex. App.—Corpus Christi–Edinburg 2020) (citing TEX. TRANSP. CODE § 81.002). The Court barely addresses this alternative ground for affirmance. Given our repeated mandate that delegations of eminent-domain authority should be strictly construed and must clearly apply, *Denbury*, 363 S.W.3d at 198; *Burch*, 518 S.W.2d at 545, I would reverse the court of appeals' holding on this point.

Texas Central argues that it wields eminent-domain authority because it qualifies as a "legal entity operating a railroad." *See* TEX. TRANSP. CODE § 81.002(2). "Operating" is the present participle of "operate" and "indicates the then-existing state of the action." *See Lyon v. State*, 766 S.W.2d 879, 885 (Tex. App.—Austin 1989, pet. ref'd). And

16

a "railroad" is "a system of transportation using special vehicles whose wheels turn on metal bars fixed to the ground, or a particular company using such a system."[19]  Taking these terms together, the statutory text indicates that the Legislature delegated eminent-domain powers to entities presently causing passenger or freight trains to run on fixed tracks.[20]  All agree that Texas Central is *not* doing so.

The court of appeals, however, construed Section 81.002 more broadly.  It reasoned that "operating a railroad" can extend to entities taking actions to "begin to operate a railroad."  635 S.W.3d at 691–92.  To do so, the court of appeals relied on the Code Construction Act's proposition that "words in the present tense include the future tense."  *Id.* at 690 (quoting TEX. GOV'T CODE § 311.012(a)).

I would not invoke the Code Construction Act here because, by its own terms, the rules it provides "are not exclusive but are meant to describe and clarify common situations."  TEX. GOV'T CODE § 311.003.  Exercises of eminent-domain authority are anything but common.  *See State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 640 (Tex. 2001) ("Proceedings to condemn land are special in character . . . .").  Reliance on a general tool is improper when it conflicts with our specific rules that govern in this context: "The legislative grant of eminent-domain

---

[19] *Railroad*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/railroad.

[20] This reading of the statute's text, which the concurring opinions deride as "illogic[al]" and "implausible," *see ante* at 2 (Hecht, C.J., concurring); *ante* at 8 (Young, J., concurring), is the same reading advanced by the State of Texas as amicus curiae.  *See* Brief of the State of Texas as Amicus Curiae 20–22.

17

power is strictly construed . . . ." *Denbury*, 363 S.W.3d at 198. Texas Central has never owned or operated a railroad, and it will take years and billions of dollars before it can ever do so. In no sense does it "plainly fall within" the terms of Section 81.002. *Pate*, 309 S.W.2d at 831.

For similar reasons, I also respectfully disagree with the CHIEF JUSTICE's concurring opinion, which would allow a "railroad business" to exercise eminent-domain power "from its inception" and "before doing any business at all"—indeed even "before incorporating." *Ante* at 3–4 (Hecht, C.J., concurring). That interpretation would be a nearly unbounded delegation of sovereign power—potentially even to a nonexistent entity—and likewise does not plainly fall within the phrase "operating a railroad." Nor is it required by unrelated statutes governing common-carrier pipelines, which involve materially different and meaningfully broader language. [21]

---

[21] For example, the pipeline statute invoked by the concurrence, *ante* at 4 (Hecht, C.J., concurring), broadly vests common-carrier powers in any person who (among other things):

> (1) owns, operates, or manages a pipeline or any part of a pipeline in the State of Texas for the transportation of crude petroleum to or for the public for hire, or engages in the business of transporting crude petroleum by pipeline; [or]
>
> . . .
>
> (4) under lease, contract of purchase, agreement to buy or sell, or other agreement or arrangement of any kind, owns, operates, manages, or participates in ownership, operation, or management of a pipeline or part of a pipeline in the State of Texas for the transportation of crude petroleum, bought of others, from an oil field or place of production within this state

To be sure, the Transportation Code allows a "railroad company" to condemn property needed for certain early-stage activities, like acquiring an initial right-of-way. *See* TEX. TRANSP. CODE § 112.053(a)(5). But that condemnation authority for certain pre-operation activities is better explained by the statute's other (but now unavailable) avenue for becoming a "railroad company."[22] Specifically, until September 2007, persons subscribed to the stock of a "*contemplated railroad*" could "be *formed into a corporation* for the purpose of *constructing*, owning, maintaining and operating such railroad."[23] The eminent-domain provisions invoked by the concurrence make better sense with this sort of "railroad company" in mind. Indeed, the Legislature's choice to use the much narrower phrase "operating a railroad" in Section 81.002(2) only further suggests that this provision does not apply to the pre-operation activities of a merely *contemplated* railroad.

I would adhere to our precedents, which I believe require that we not permit the exercise of the sovereign power of eminent domain unless the Legislature "clearly" authorized it. *See Burch*, 518 S.W.2d at 545.

---

> to any distributing, refining, or marketing center or reshipping point within this state . . . .

TEX. NAT. RES. CODE § 111.002(1), (4).

[22] *See* TEX. TRANSP. CODE § 81.002(1) (stating that references to a "railroad company" include "a railroad incorporated before September 1, 2007, under former Title 112, Revised Statutes").

[23] Act of May 26, 1989, 71st Leg., R.S., ch. 971, § 1, 1989 Tex. Gen. Laws 4048, 4048 (emphases added) (amending TEX. REV. CIV. STAT. art. 6259(a)) (repealed 2007).

19

Because the Legislature has not done so, I would hold that Texas Central does not qualify as a "railroad company."

* * *

Whether Texas Central's project will succeed is anyone's guess.[24] What is certain is that today's decision places Miles and hundreds of other Texas landowners at Texas Central's mercy. Texas Central may take their land and, if the project succeeds, bisect each parcel with an enormous infrastructure project on which a train blazes past at 200 miles per hour every thirty minutes. Or it could begin construction and abandon the project, unfinished, leaving behind half-built viaducts leading nowhere. Or it may take their land and do nothing for a decade, triggering a feeble repurchase "remedy" for landowners. *See* TEX. PROP. CODE §§ 21.101–.103. I agree with the Court's view that it is the Legislature's province to address the propriety of the remedies available to landowners who find themselves in Texas Central's path. But legislative action is needed only because the Court wrongly grants eminent-domain authority to private actors, unaccountable to the public, for a project that the Legislature could not possibly have contemplated.

I respectfully dissent.

---

[24] Amici point out that high-speed rail projects are notoriously difficult to complete, and most that get built are unprofitable. *E.g.*, Brief of Grimes County et al. as Amici Curiae 8–10. They submit that Texas Central's estimated costs have tripled since the project's inception and that Texas Central has raised only a minute fraction of the needed capital and has been delinquent in paying property tax in eight Texas counties along the proposed route. *Id.* at 16–17; Supp. Brief of Grimes County et al. as Amici Curiae 3–4.

_____
Rebeca A. Huddle
Justice

**OPINION FILED:** June 24, 2022