WELLS, Judge.
 

 Nadim Yaqubie seeks a writ of prohibition claiming immunity from prosecution under section 776.032 of the Florida Statutes (2008). The State of Florida seeks review of an order reducing the original second degree murder charge filed against Yaqubie to manslaughter. We grant the writ and remand for an evidentiary hearing to determine whether Yaqubie’s immunity claim is supported by the preponderance of the evidence. We also find that the second degree murder charge must be reinstated should the court below determine that Yaqubie is not immune from prosecution.
 

 Undisputed Facts
 

 The essential facts involved here are not disputed. In the early hours of May 18, 2008, in an alley in Miami Beach, nineteen-year-old Nadim Yaqubie stabbed fifty-year-old Robert Camacho multiple times with a seven-inch knife. Two of these wounds were sufficiently serious to cause Camacho’s death.
 

 Petition for Writ of Prohibition (Immunity)
 

 On May 19, Yaqubie was arrested and charged with second degree murder. Yaqubie does not deny that he stabbed Camacho to death, but claims that the stabbing occurred while Camacho was assaulting, battering, or robbing him, making him immune from prosecution under section 776.032 of the Florida Statutes.
 
 See
 
 § 776.032, Fla. Stat. (2008) (commonly referred to as the “Stand Your Ground” law and providing that a person who uses force as authorized in sections 776.012, 776.013, or 776.031, “is immune from criminal prosecution and civil action for use of such force”); § 776.012, Fla. Stat. (2008) (providing that use of deadly force is justified where an individual “reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony”); § 776.08, Fla. Stat. (2008) (defining “forcible felony” as including aggravated assault, aggravated battery, and robbery).
 

 The court below, applying the standard enunciated in
 
 Velasquez v. State,
 
 9 So.3d 22 (Fla. 4th DCA 2009), essentially treated Yaqubie’s immunity claim as an affirmative defense and denied the motion to dismiss because “material facts [were] at issue in the case.” Yaqubie claims that the court below applied the incorrect standard and should have applied the standard enunciated in
 
 Peterson v. State,
 
 983 So.2d 27 (Fla. 1st DCA 2008), to determine whether a preponderance of the evidence shows that he is immune from prosecution under section 776.032. We agree with Ya-qubie and therefore grant the instant writ.
 

 In
 
 Velasquez,
 
 the Fourth District Court of Appeal addressed the procedure to be followed in handling section 776.032 motions. Looking to Florida Rule of Criminal Procedure 3.190(c)(4), the court concluded that a motion to dismiss on section 776.032 immunity grounds must be denied when, on no more than a specific denial in a traverse, a material disputed fact issue is made to appear, in effect treating such a claim as an affirmative defense:
 

 Rule 3.190(c)(4) of the Florida Rules of Criminal Procedure provides for the filing of a motion to dismiss when “[t]here are no material disputed facts and the undisputed facts do not estab
 
 *476
 
 lish a prima facie case of guilt against the defendant.” Subsection (d) allows for the state to traverse or demur the motion and for the court to receive evidence on any issue of fact. It then provides that “[a] motion to dismiss under subdivision (c)(4) of this rule shall be denied if the state files a traverse that, with specificity, denies under oath the material fact or facts alleged in the motion to dismiss.” Fla. R. Civ. P. 3.190(d).
 

 Velasquez,
 
 9 So.3d at 23-24.
 

 In
 
 Peterson,
 
 the First District Court of Appeal decided that section 776.032 is a true immunity provision, not merely an affirmative defense, which requires a trial court to adjudicate disputed fact issues rather than passing them on to a jury as it would an affirmative defense:
 

 We now hold that when immunity under this law is properly raised by a defendant, the trial court must decide the matter by confronting and weighing only factual disputes. The court may not deny a motion simply because factual disputes exist.
 

 [[Image here]]
 

 Likewise we hold that a defendant may raise the question of statutory immunity pretrial and, when such a claim is raised, the trial court must determine whether the defendant has shown by a preponderance of the evidence that the immunity attaches.... We reject any suggestion that the procedure established by rule 3.190(c) should control so as to require denial of a motion whenever a material issue of fact appears.
 

 Peterson,
 
 983 So.2d at 29-30.
 

 Florida’s Second and Fifth District Courts of Appeal have now adopted the standard and procedure enunciated in
 
 Peterson,
 
 as we do now by virtue of this decision.
 
 See Horn v. State,
 
 17 So.3d 836, 839 (Fla. 2d DCA 2009) (‘We agree with the First District — that our legislature intended to create immunity from prosecution rather than an affirmative defense and, therefore, the preponderance of the evidence standard applies to immunity determinations.”);
 
 Gray v. State,
 
 13 So.3d 114, 115 (Fla. 5th DCA 2009) (“In our prior opinion, which was issued virtually simultaneously with
 
 Velasquez,
 
 we adopted the procedure described in
 
 Peterson.
 
 Now, with the benefit of
 
 Velasquez,
 
 we see no reason to alter our opinion.”). The petition for writ of prohibition is, therefore, granted with this matter remanded to the court below for an evidentiary hearing applying the standard enunciated in
 
 Peterson.
 
 To the extent this decision conflicts with the Fourth District’s decision in
 
 Velasquez,
 
 we certify conflict.
 

 Motion to Dismiss
 

 We also reverse the order granting Ya-qubie’s Rule 3.190(c)(4) motion to dismiss which reduced the original second degree murder charge filed against him to a charge of manslaughter. Second degree murder is defined as the “unlawful killing of a human being, when perpetrated by an act imminently dangerous to another and evincing a depraved mind regardless of human life.... ” § 782.04(2), Fla. Stat. (2008). As the Standard Jury Instruction on second degree murder confirms, an act is “imminently dangerous to another and demonstrating a depraved mind” if it is one that:
 

 1. A person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and
 

 2. is done from ill will, hatred, spite, or an evil intent, and
 

 3. is of such a nature that the act itself indicates an indifference to human life..
 

 Fla. Std. Jury Instr. (Crim.) 7.4 Murder.
 

 Yaqubie does not claim that stabbing someone in the abdomen and chest so hard
 
 *477
 
 that it actually results in death is either not an act that a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury or is not an act indicative of an indifference to human life. Rather he claimed below that because he was acting in self-defense, ill will, hatred, spite, or evil intent could not be demonstrated requiring either dismissal of the second degree murder charge against him or reduction of that charge to manslaughter. The court below agreed with Yaqubie, concluding that the facts leading up to Camacho’s death were “insufficient as a matter of law to prove the evil intent or ill will necessary to rebut the defendant’s claim of self-defense to the charge of second-degree murder.” We cannot agree with this determination.
 

 The facts largely come from a statement made by Yaqubie to the police following his arrest. According to Yaqubie, who was nineteen years old at the time, he travelled to Miami a few days before the stabbing took place “[bjecause nobody liked [him] in New York,” and because he needed a mini-vacation. He ultimately was going to Tampa to “get stronger” so that “people [would] stop picking on [him].”
 
 [1]
 

 On the evening of May 18, Yaqubie took a bus from his hotel to Washington Avenue and 16th Street on Miami Beach. As he exited the bus, one of three black men offered to sell drugs and fake identification to him. Although he declined the offer of drugs and initially the offer of fake identification, Yaqubie later returned to purchase fake identification so that he could “get into like the good nightclubs.”
 

 To make this purchase, Yaqubie accompanied one of the men down Washington Avenue where Yaqubie withdrew $60 from an ATM. After waiting almost an hour, Yaqubie and the man were joined by four or five more black men and a “Mexican” and “they” offered to sell identification to him for $50. Yaqubie agreed and purchased what turned out to be Camacho’s (whom Yaqubie referred to as the “Mexican”) expired Virginia driver’s license. According to Yaqubie, almost as soon as this transaction was completed, the black men left with his money and Camacho demanded return of the identification, claiming it to have been merely rented and not sold to Yaqubie. When Yaqubie refused to return the identification, Camacho threatened to “[f_] [Yaqubie] up.”
 

 Yaqubie admitted that at this juncture he was not frightened by Camacho or his threats because he was too busy concentrating on getting into a nightclub:
 

 He said that’s my ID, ... and I told him I already bought it. He said no, no, like you’re just going to use it to get into the nightclub and then you’re going to give it back to me. And then he started threatening me if I don’t, he’ll [f_] me up, he’ll do this and that. He said he knows those black people, they’re probably a gang and stuff and he will get them on me and stuff. I wasn’t paying attention at first. Mostly I was just focusing on getting to the nearest nightclub....
 

 And although Yaqubie claims that later, while waiting in line to get into a nightclub, he got scared when he noticed Camacho staring at him, Yaqubie did nothing to secure assistance. Rather, Yaqubie left the line and engaged Camacho in conversation. When Yaqubie was unable to convince the older, heavier man to let him keep the identification, Yaqubie decided to lose him:
 

 
 *478
 
 I walked, I was getting farther away from the club, towards 16th Street and like I really wanted to keep the ID and I asked him how much he wants for it. He said no, I need it, I don’t care how much. I asked him if he can help me find another and he said no, [f-] you, you wasted too much time, you wasted too much of my time.
 

 [[Image here]]
 

 And I basically didn’t want ... I just lost sixty dollars for nothing so I tried to run for it and like, I tried to lose him.
 

 [[Image here]]
 

 I went into a dark alley. I didn’t think he would run fast enough considering how old he is and his physique.
 

 Yaqubie was, however, surprised that the significantly older and heavier man caught up with him in the alley where Yaqubie sought to hide. And, when Camacho shouted threats at Yaqubie and grabbed his arm with both hands, Yaqubie “panicked,” his “instincts took over” and he pulled a seven-inch knife from his pocket and began to stab Camacho in the abdomen:
 

 He catches up, and like he started screaming, I’ll [f_] you up, I’ll [f_] you up, in a very loud tone because nobody was around he didn’t held [sic] back his voice. He grabbed my, my right arm, upper arm with both his hands, and like he started pulling very hard and he scared me. I thought I was, he was going to do something on me because like, I don’t know, I just like, I panicked.
 

 [[Image here]]
 

 ... I thought maybe he was going to kill me for like trying to run off on him.
 

 [[Image here]]
 

 I grew too frightened. I just, I don’t know, like instincts take, took over. I just quickly took the knife ... [a]nd like, I took three jabs on him ... [a]round his abdominal.
 

 According to Yaqubie, Camacho then let go of his arm and said, “You want a piece of me? Fine” and threw a book bag he had been carrying at Yaqubie. The book bag “didn’t do much” other than cut Yaqu-bie’s middle finger “a little.” Then, not seeing a weapon in Camacho’s possession because “[i]t was too dark to tell,” but thinking that Camacho “might have like pulled like some kind of like weapon” because the man had not immediately run away after being stabbed three times in the abdomen, Yaqubie “rushed” Camacho, stabbing him so violently in the chest with the knife that he believed that Camacho was going to die.
 

 Yaqubie then stuck the knife in his pocket and ran. He did not, however, run for help either for himself or for the man he believed he had just stabbed to death. Rather, he hailed a taxi and had it drop him of at a Domino’s pizzeria. Because the pizzeria was closed, he returned to his hotel where he was directed to a nearby restaurant where he went to eat. After a meal, he returned to his room where he went to sleep until a little after noon the following day.
 

 The following day, Yaqubie relaxed. He had a light snack, exercised, took a bus to Lincoln Road and Aventura Mall, returned to his hotel and dressed for clubbing that night. To avoid entanglement with the black men from the night before, he wore a hooded jacket and made sure to take his knife along. Although he was able to get into a club without showing identification, he was rousted by club security for disturbing another patron. He was searched and the knife and Camacho’s expired Virginia driver’s license were found. The police were called, Yaqubie was arrested and he made a voluntarily statement.
 

 
 *479
 
 Although there were no other witnesses to these events, two women staying at a hotel adjacent to the alleyway where the stabbing occurred advised the police that, while hearing no loud threats coming from the alley at the time of the incident, they both heard a male voice say, “Don’t do that! Don’t do that!” One of the women stated that when she heard the male voice yell, she looked out of her hotel room window to see two men disengage from one another in the alleyway and head in opposite directions. Alarmed, she went into the alley where she found Camacho collapsed on the ground, unconscious and bleeding heavily. No weapons were found on Camacho, in his backpack or anywhere in the alleyway. Camacho died of fatal stab wounds to the heart and the right lung.
 

 According to Yaqubie, these facts establish that he acted in self-defense, thereby negating the State’s ability to prove the ill-will or evil intent essential to a second degree murder charge. We disagree.
 

 As this court on more than one occasion has stated, the purpose of a Rule 3.190(c)(4) motion is to test the legal sufficiency of the charges brought by the State, it is not to require the State to demonstrate that it will secure a conviction at trial.
 
 See State v. Arnal,
 
 941 So.2d 556, 558 (Fla. 3d DCA 2006) (stating that “[t]o avoid dismissal under this rule, the State is not obligated to pre-try its case, only to provide sufficient facts, when viewed in a light most favorable to the State, to show that a reasonable jury could rule in its favor”);
 
 State v. Ortiz,
 
 766 So.2d 1137, 1142 (Fla. 3d DCA 2000) (to counter a Rule 3.190(c)(4) motion to dismiss, the State “need not adduce evidence sufficient to sustain a conviction”). In this case, Yaqubie convinced the court below that the State could not demonstrate the ill-will, spite, hatred, or evil intent essential to a second degree murder charge because he was acting in self-defense when he stabbed Camacho. But Yaqubie’s characterization of his actions as defensive is not determinative. To the contrary, the facts are equivocal
 
 [2]
 
 and may be characterized as defensive or as spiteful, hateful, or evil and whether Yaqubie was acting in self-defense or as an aggressor out of hatefulness or spite is for a jury, not for the defendant or the court, to decide.
 
 See Amal,
 
 941 So.2d at 558-59 (confirming that it is not proper on a Rule 3.190(c)(4) motion to determine factual issues, to weigh evidence, or to determine credibility);
 
 State v. Stewart,
 
 404 So.2d 185, 186 (Fla. 5th DCA 1981) (finding that the trial court erred in assuming that the defendant’s version of the victim’s death had to be accepted and in dismissing a second degree murder charge under Rule 3.190(c)(4) for a fatal stabbing where “[t]he type of wound and direction of the blow are sufficient alone to cast considerable doubt on the defendant’s stories concerning an accidental cutting”);
 
 State v. Milton,
 
 488 So.2d 878, 879 (Fla. 1st DCA 1986) (concluding that it was improper for the trial judge to consider the issues of self-defense and premeditation in a(c)(4)
 
 *480
 
 motion to dismiss since they were questions for a jury not a judge to decide).
 

 As was aptly stated by the Second District Court of Appeal in
 
 State v. Rogers,
 
 386 So.2d 278, 280 (Fla. 2d DCA 1980), where the trial court similarly resolved the issue of whether the defendant’s actions “evincfed] a depraved mind regardless of human life”:
 

 [Ijntent or state of mind is not an issue to be decided on a motion to dismiss under Rule 3.190(c)(4). Instead, it is usually inferred from the circumstances surrounding the defendant’s actions. Since the trier of fact has the opportunity to weigh the evidence and judge the credibility of the witnesses, it should determine intent or state of mind.
 

 See also Arnal,
 
 941 So.2d at 559 (finding that “[wjhile intent or state of mind may, as the trial court correctly noted, be difficult to establish, it is not, as we have stated ‘an issue to be decided on a motion to dismiss under Rule 3.190(c)(4).’ ” (quoting
 
 State v. Book,
 
 523 So.2d 636, 638 (Fla. 3d DCA 1988))).
 

 The motion to dismiss should, therefore, have been denied.
 

 Accordingly, the petition for writ of prohibition is granted and conflict with
 
 Velasquez
 
 certified. The order granting the motion to dismiss and reducing the second degree murder charge to manslaughter is reversed.
 

 [1]
 

 . Yaqubie described himself as a loser who was picked on in high school and community college. While he denied picking fights with others, he admitted that he had "probably broken fingers and ... bruised up people. ...”
 

 [2]
 

 . Yaqubie candidly admitted that when he initially ran from Camacho he did so not out of fear, but because he wanted to keep Camacho’s identification. Yaqubie also confirmed that when Camacho caught up with him in the alley, Camacho posed no greater threat than he had when Yaqubie ran from him as Camacho was unarmed. Yaqubie nonetheless began stabbing Camacho when Camacho grabbed his arm, finally stabbing Camacho to death when he continued to resist. These actions are as capable of being characterized as a hateful, spiteful, and evil attempt to get rid of this bothersome man, as they are of being construed as defensive actions against an aggressor.