LINDSEY, J.
The State of Florida appeals the trial court's order granting Michell Espinoza's motion to dismiss the information charging him with three counts. In Count 1, the State charged Espinoza with unlawfully engaging in the business of a money transmitter and/or a payment instrument seller without being registered with the State of Florida in violation of section 560.125, Florida Statutes (2013), and, in Counts 2 and 3, with money laundering in violation of section 896.101, Florida Statutes (2014). The trial court erred in dismissing Count 1 because Espinoza acted as both a money transmitter and a payment instrument seller and, as such, was required to register with the State of Florida as a money services business. The trial court erred in dismissing Counts 2 and 3 on the basis that Espinoza lacked the requisite intent to be guilty of money laundering. Intent, or lack thereof, is a factual issue that should not have been resolved at the pleading stage. Accordingly, we reverse the trial court's dismissal order and remand for further proceedings consistent with this opinion.
*1058 I. INTRODUCTION
The instant appeal concerns the application of Florida's statutes governing money services businesses and money laundering found in chapters 560 and 896 of the Florida Statutes, respectively, to alleged illicit transactions involving the virtual currency known as Bitcoin. At all times relevant, there was no mention of virtual currency nor of Bitcoin anywhere within the Florida Statutes. Both Espinoza and the State, as well as the amici, cite to various guidelines and regulations promulgated by the United States Department of the Treasury and other federal agencies to argue for or against the application of certain defined terms under section 560.103, Florida Statutes (2014), to virtual currency.
In 2014, the United States Department of the Treasury closely coordinated with the Financial Action Task Force ("FATF"), of which the United States is a leading member nation, to develop common definitions for virtual currency terms. The following definition for "virtual currency," which informs our decision, was proposed in a June 2014 report:
Virtual currency is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status (i.e., when tendered to a creditor is a valid and legal offer of payment) in any jurisdiction.
See Financial Action Task Force, Virtual Currencies: Key Definitions and Potential AML/CFT Risks 4 (2014). The FATF Virtual Currencies Report identified and explained Bitcoin as follows:
Bitcoin, launched in 2009, was the first decentralized convertible virtual currency, and the first cryptocurrency. Bitcoins are units of account composed of unique strings of numbers and letters that constitute units of the currency and have value only because individual users are willing to pay for them. Bitcoins are digitally traded between users with a high degree of anonymity and can be exchanged (purchased or cashed out) into US dollars and other fiat or virtual currencies. Anyone can download the free, open-source software from a website to send, receive, and store bitcoins and monitor Bitcoin transactions. Users can also obtain Bitcoin addresses, which function like accounts, at a Bitcoin exchanger or online wallet service. Transactions (fund flows) are publicly available in a shared transaction register and identified by the Bitcoin address, a string of letters and numbers that is not systematically linked to an individual. Bitcoin is capped at 21 million bitcoins (but each unit could be divided into smaller parts).
Id. This definition comports with that alleged in the arrest affidavit, which specifically stated that Bitcoin is:
an electronic currency with no central authority and is not backed by any government. Bitcoins do not exist as discrete and unique single coins, but rather as balances of Bitcoins and Bitcoin portions. These balances exist as unique internet Bitcoin addresses contained in a public transportation ledger, called the "block chain." This ledger is maintained and verified by computers connected to the internet running the Bitcoin software. New Bitcoins are created at a predetermined rate and distributed to owners of those computers that are maintaining the ledger in a process referred to as "mining." The software is open source and can be installed by anyone who wishes to "mine" Bitcoins.
....
To transfer some amount of Bitcoins, the spender directs that amount to be debited from the balance of his or her *1059 unique internet Bitcoin address and deposited to the balance of the receiver's unique Bitcoin address. This is frequently done through the use of wallet applications. The transaction is then verified by the miners to confirm that the correct keys were used and then it is added to the block chain. This prevents double spending because once the balance moves to a new unique address, a different private key becomes associated with it.
Bitcoins can be transferred both in person and over the internet and are readily convertible to most world currencies. Exchanges exist that allow people to buy or sell Bitcoins with or for local currencies including United States dollars.
... Bitcoins can also be used to purchase a variety of goods and services directly. Restaurants, coffee shops and cosmetic surgery clinics in Miami-Dade County accept Bitcoins for goods and services.
During the time leading up to the State's filing of the information, Espinoza was operating an unlicensed cash-for-bitcoins business. Espinoza came to the attention of law enforcement by way of an advertisement he posted on the internet for his services under the name "Michelhack." During four separate meetings with an undercover law enforcement agent, Espinoza agreed to trade bitcoins in exchange for cash. During their initial encounter, the undercover agent made clear to Espinoza his desire to remain anonymous. Espinoza agreed to engage in these transactions even though the agent intimated to Espinoza that this cash was derived from engaging in illegal activity and that he was planning to use the bitcoins to engage in further illegal activity. Against this backdrop, we apply the Florida Statutes and rules of procedure as they existed at the time of the alleged conduct to the facts of this case to determine whether the trial court erred in dismissing the information filed against Espinoza.
II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
On December 4, 2013, Detective Arias of the Miami Beach Police Department, working in conjunction with Special Agent Ponzi from the United States Secret Service's Miami Electronic Crimes Task Force ("Task Force"), accessed the Internet website https://localbitcoins.com seeking to purchase Bitcoin. This website is a directory of buyers and sellers of bitcoins and lists the traders closest to the user's location. Users may search for sellers who will sell bitcoins online or in person for United States currency. Detective Arias discovered multiple individuals advertising the sale of bitcoins for United States currency in the Miami-Dade area including a user utilizing the username Michelhack, who was later identified as Espinoza. Michelhack's posting stated:
Contact Hours: anytime
Meeting preferences: Starbucks, internet café, restaurant, mall or bank
You will need to bring your wallet in your smartphone for the address the bitcoins will be deposited to
If you want to have localbitcoins escrow service I will have to add 1% to the final price
You will pay with cash in person
Call or text (XXX) XXX-8649 for further information
I will meet you in person for this transaction
Detective Arias, acting in an undercover capacity as an interested buyer, contacted the number listed in the advertisement for Michelhack via text message and requested a meeting in Miami Beach in order to *1060 exchange U.S. currency (cash) for bitcoins. The next day, Detective Arias met Espinoza at Nespresso Café located at 1105 Lincoln Road, Miami Beach, FL (the "first transaction"). At this meeting, which was observed and recorded by undercover supporting agents, Detective Arias paid Espinoza $ 500 in cash and received 0.40322580 bitcoins valued at $ 416.12. Espinoza earned a fee or profit of $ 83.67.
During the course of the first transaction, Detective Arias made clear his desire to remain anonymous and implied to Espinoza that he was involved in illicit activity. He made clear to Espinoza that he "did not want to have to provide a name or personal identification information to a bank or financial institution in order to conduct financial transactions." While not expressly representing to Espinoza that the $ 500 was the proceeds of an illegal transaction, Detective Arias certainly implied as much in that he told Espinoza, "since Liberty Reserve was shut down, I need a new way to 'pay for things.' " Espinoza "[a]cknowledged that he was familiar with Liberty Reserve," which "was a digital currency that was used for illicit transactions." Detective Arias further explained that "the people I do business with don't take credit cards" to which Espinoza replied "obviously." Based on their conversation, Detective Arias believed Espinoza was under the impression Detective Arias was himself involved in illicit criminal activity. In addition, Espinoza explained to Detective Arias how he makes money trading Bitcoin.
On January 10, 2014, Detective Arias contacted Espinoza and arranged to meet at an ice cream store in Miami Beach (the "second transaction"). During the course of the second transaction, Espinoza told Detective Arias he had multiple "Bitcoin wallets" that he used to store and transfer bitcoins. Detective Arias told Espinoza that he was in the business of buying stolen credit card numbers from Russian sellers, and that he needed the bitcoins to pay for those stolen credit card numbers. Detective Arias also told Espinoza he would be willing to trade stolen credit card numbers for bitcoins at their next transaction. Espinoza replied that he would "think about it." Espinoza then transferred one bitcoin to Detective Arias' Bitcoin address in exchange for $ 1000. Special Agent Ponzi calculated Espinoza's fee or profit for this second transaction to be approximately $ 167.56.
On January 27, 2014, Detective Arias searched databases for the Florida Office of Financial Regulation ("OFR") and the United States Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") to determine whether Espinoza was registered as a "money services business." The search revealed that Espinoza was not registered in either database. Three days later, Detective Arias contacted Espinoza to arrange another transaction (the "third transaction"). Communicating exclusively through text messages, Detective Arias inquired of Espinoza how quickly the transaction could be completed stating, "How fast will u (sic) send me the [bitcoin] cuz (sic) my Russian buddies won't send me my [stuff] until they get the coin." Detective Arias then deposited $ 500 into Espinoza's Citibank bank account and provided Espinoza with Detective Arias' Bitcoin address. Espinoza then electronically transferred 0.54347826 bitcoins to Detective Arias' Bitcoin address.
After Detective Arias received the Bitcoin transfer, he texted Espinoza asking if he was able to "step it up next week." Espinoza replied, "OK. Sure. Let me know how many." Thereafter, Detective Arias negotiated the transfer of an additional $ 30,000 worth of bitcoins for a new batch of stolen credit card numbers Detective *1061 Arias represented to Espinoza to have been acquired from a recent data breach (the "fourth transaction"). On February 6, 2014, Detective Arias met Espinoza in the lobby of a Miami Beach hotel with the dual intent of conducting the fourth transaction and effectuating Espinoza's arrest. Detective Arias led Espinoza upstairs to a hotel room, which the Task Force had previously wired for audio and video surveillance to observe and record the transaction.
However, when Detective Arias produced a "flash roll" purportedly containing the $ 30,000 in $ 100 bills, Espinoza grew concerned the funds were counterfeit - which they, in fact, were. Espinoza inspected the bills and suggested either depositing a portion of the $ 30,000 into a bank or for Detective Arias to return with smaller denominations in order to verify the authenticity of the flash roll. Espinoza remained ready and willing to consummate the entire transaction, his only hesitation being with regard to the authenticity of the $ 30,000 in cash. Shortly thereafter, Detective Arias gave a signal and Espinoza was taken into custody without incident.
Just over a month following the fourth transaction, the State charged Espinoza, via information, with one count of unlawfully engaging "in the business of money transmitter while not being registered as a money transmitter or authorized vendor" in violation of sections 560.125(1) and (5)(a), Florida Statutes (2013)[1] (Count 1) and two counts of money laundering, in violation of sections 896.101(3) and 896.101(5)(a) and (b), Florida Statutes (2014) (Counts 2 and 3). At the hearing below, the State orally amended the information to include a payment instrument seller. Espinoza moved to dismiss the information pursuant to Florida Rule of Criminal Procedure 3.190(c)(4) contending that the undisputed facts do not establish a prima facie case of guilt against him.
More specifically, Espinoza argued as to Count 1 that Bitcoin does not qualify as "money transmitting" under section 560.125, because Bitcoin is not "money" under the statute. Espinoza argued as to Counts 2 and 3 that Bitcoin does not fall under the definition of a "financial transaction" or "monetary instrument" under Florida's Money Laundering Act. In response, the State filed a traverse as to Count 1 and moved to strike Espinoza's motion as to Counts 2 and 3. After a hearing, the trial court entered an order granting Espinoza's motion to dismiss the information in its entirety. The trial court agreed with Espinoza that neither Bitcoin nor his conduct with respect thereto fall within the ambit of chapter 560 requiring registration as a money services business. As to Counts 2 and 3, the trial court disagreed with Espinoza and found instead that the conduct at issue qualifies as a financial transaction but, nonetheless, granted the motion on the basis Espinoza lacked the requisite intent to be guilty of money laundering. This timely appeal followed.[2]
III. JURISDICTION
Pursuant to section 924.07(1)(a), Florida Statutes (2016), and *1062 Florida Rule of Appellate Procedure 9.140(c)(1)(A), the State is permitted to appeal the trial court's order dismissing the information. See Fla. R. App. P. 9.140(c)(1)(A) ("The state may appeal an order [ ] dismissing an indictment or information or any count thereof ...."; see also § 924.07(1)(a) (using identical language as that found in Rule 9.140(c)(1)(A) to grant the State a right to appeal a trial court's order dismissing an information).
The State's appeal is timely because the notice of appeal was filed within "15 days of rendition of the order to be reviewed." Fla. R. App. P. 9.140(c)(3). Accordingly, this Court has jurisdiction to review the instant appeal under Florida Rule of Appellate Procedure 9.140(c)(1)(A). See State v. Jiborn, 135 So.3d 364, 365 n.2 (Fla. 5th DCA 2014) (explaining that "[a]ppellate review is authorized pursuant to Rule 9.140(c)(1)(A)" to consider the State's appeal of the trial court's order granting the motion to dismiss the amended information).
IV. STANDARD OF REVIEW
The standard of review for a trial court's order based on statutory interpretation is de novo . See Mendenhall v. State, 48 So.3d 740, 747 (Fla. 2010). Further, the standard of review for a trial court's order regarding a Rule 3.190(c)(4) motion to dismiss is de novo . See Knipp v. State, 67 So.3d 376, 378 (Fla. 4th DCA 2011) (citing State v. Santiago, 938 So.2d 603, 605 (Fla. 4th DCA 2006) ); see also State v. Walthour, 876 So.2d 594, 595 (Fla. 5th DCA 2004) (citing Bell v. State, 835 So.2d 392 (Fla. 2d DCA 2003) ).
V. ANALYSIS
Pursuant to Florida Rule of Criminal Procedure 3.190(c)(4), an individual is permitted to file a motion to dismiss an information or indictment on grounds that "[t]here are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt against the defendant." A Rule 3.190(c)(4) motion to dismiss in criminal cases is treated like a summary judgment motion in civil cases and should be sparingly granted. See State v. Nunez, 881 So.2d 658, 660 (Fla. 3d DCA 2004) (citation omitted); see also State v. Bonebright, 742 So.2d 290, 291 (Fla. 1st DCA 1998) (explaining that a Rule 3.190(c)(4) motion to dismiss is "analogous to a motion for summary judgment in a civil case" and that "[b]oth should be granted sparingly" (citation omitted) ).
A. Unlicensed Money Services Business (Count 1)
The issue for our determination under Count 1 is whether, based on the undisputed facts, Espinoza was acting as a payment instrument seller or engaging in the business of a money transmitter, either of which require registration as a money services business under Florida law. Given the plain language of the Florida statutes governing money service businesses and the nature of Bitcoin and how it functions, Espinoza was acting as both. Section 560.125, Florida Statutes (2013), provides, in pertinent part, as follows:
(1) A person may not engage in the business of a money services business or deferred presentment provider in this state unless the person is licensed or exempted from licensure under this chapter.
....
(5) A person who violates this section, if the violation involves:
(a) Currency or payment instruments exceeding $ 300 but less than $ 20,000 in any 12-month period, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
*1063 (emphasis added). A "money services business" is defined as "any person ... who acts as a payment instrument seller , foreign currency exchanger, check casher, or money transmitter ." § 560.103(22), Fla. Stat. (2014) (emphasis added). The Florida Legislature has defined a "payment instrument seller" in this section as "a corporation, limited liability company, limited liability partnership, or foreign entity qualified to do business in this state which sells a payment instrument." § 560.103(30). Moreover, a "payment instrument" is "a check, draft, warrant, money order, travelers check, electronic instrument, or other instrument, payment of money, or monetary value whether or not negotiable ." § 560.103(29) (emphasis added). "Monetary value" means a medium of exchange, whether or not redeemable in currency . § 560.103(21) (emphasis added). The Legislature has further defined a "money transmitter" as:
[A] corporation, limited liability company, limited liability partnership, or foreign entity qualified to do business in this state which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services or other businesses that facilitate such transfer within this country, or to or from this country.
§ 560.103(23) (emphasis added).
Espinoza does not dispute that he was not licensed to act as a money services business in the State of Florida. Rather, Espinoza contends his transactions with Detective Arias do not qualify as such on the grounds that (1) Bitcoin is not "money" or "monetary value" for purposes of the statutes governing money services businesses; (2) "money," "monetary value" and "funds" under chapter 560 should be interpreted to mean "currency" and neither Bitcoin nor bitcoins are currency; (3) because Espinoza was merely a seller of bitcoins, his conduct does not meet the statutory definition of being a money transmitter or payment instrument seller; (4) section 560.125 requires the transmission of money to a third-party or location and that did not occur here; and, (5) applying section 560.125 to Espinoza's conduct would violate his due process rights. These arguments ignore the plain meaning of the words used in the statutes. Inasmuch, Espinoza urges this court to apply the statutes as he wishes they were written instead of how they actually are written. We decline to do so.
Espinoza is charged in Count 1 with engaging "in the business of money transmitter while not being registered as a money transmitter" in violation of section 560.125 governing money services businesses. Pursuant to section 560.103(22), a " 'money services business' means any person ... who acts as a payment instrument seller ...." We need not look beyond the plain and unambiguous language of section 560.103 to conclude Espinoza acted as a "payment instrument seller" when he transferred bitcoins from one of his online bitcoin wallets to Detective Arias' online bitcoin address in exchange for cash in U.S. dollars.
There is no dispute that Bitcoin does not expressly fall under the definition of "currency" found in section 560.103(11).[3] However, *1064 Bitcoin does fall under the definition of a "payment instrument." See § 560.103(29). Included in the definition of a payment instrument is "monetary value," which is defined as "a medium of exchange, whether or not redeemable in currency." §§ 560.103 (21), (29). According to the arrest affidavit and the FATF Virtual Currency Report, referenced above, bitcoins are redeemable for currency. Espinoza does not argue to the contrary. Similarly, Bitcoin and bitcoins function as a "medium of exchange." See § 560.103(21).
The transactions at issue illustrate this point. Espinoza's own expert testified there were several restaurants in the Miami area that accept bitcoins as a form of payment, as well as a prominent Miami plastic surgeon, and conceded he was paid in bitcoins for his expert services in this case. Further, Espinoza was not merely selling his own personal bitcoins, he was marketing a business on https://localbitcoins.com. The service being marketed was the exchange of cash for bitcoins. Espinoza's posting expressly stated: "You will pay with cash in person" and "You will need to bring your wallet in your smartphone for the address the bitcoins will be deposited to."
Apart and aside from the plain language of the statute, the Florida OFR, the Florida state agency charged with regulation under chapter 560, has concluded a business offering a service "where a Coinbase user sends fiat currency to another Coinbase user to buy bitcoins" was subject to regulation thereunder. See In re Coinbase, Inc., Case No. 62670 (Fla. OFR November 13, 2015) (available from the agency clerk); see also § 560.105, Fla. Stat. (2014) (empowering the Office of Financial Regulation to regulate money services businesses). Like the Coinbase user, Detective Arias paid cash to Espinoza to buy bitcoins. Like the Florida OFR with respect to the Coinbase user, we conclude Espinoza was required to register under chapter 560.
In addition to claiming he is not a payment instrument seller, Espinoza asserts Bitcoin does not qualify as "money" or "monetary value" for purposes of being a "money transmitter." He argues the Florida Legislature could not have contemplated the application of section 560.125 to virtual currencies when the statute was enacted. As such, Bitcoin cannot be considered currency because it is not legal tender on the basis that the terms "money" and "monetary value" are considered synonymous with the term "currency." They are not.
However, we need not consider legislative intent because section 560.103 is clear and unambiguous. Any assertion that "monetary value" is synonymous with "currency" overlooks the express language contained in section 560.103(21) which states that monetary value is "a medium of exchange, whether or not redeemable in currency." Espinoza's interpretation overlooks the "statutory tenet that courts should avoid readings that would render part of a statute meaningless." Koile v. State, 934 So.2d 1226, 1233 (Fla. 2006) (citing Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 456 (Fla. 1992) ). In addition, Espinoza's interpretation, which we decline to adopt, compelling that "monetary value" be synonymous with "currency" would render section 560.103(21) meaningless.
As a further grounds for dismissal, Espinoza argued, and the trial court concluded, that he did not qualify as a "money transmitter" because he did not receive *1065 currency, monetary value, or payment instruments for the purpose of transmitting the same to a third party. However, nothing contained within the definition of "money transmitter" under section 560.103(23) includes, explicitly or impliedly, the words "to a third party." The trial court reasoned that a "money transmitter" would necessarily operate like a middleman in a financial transaction, much like how Western Union accepts money from person A, and at the direction of person A, transmits it to person or entity B.
Chapter 560 defines a "money services business" as "any person" who "acts as a ... money transmitter." § 560.103(22). "Money transmitter" is then defined as an entity "which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means , including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services." § 560.103(23) (emphasis added). The statute's plain language clearly contains no third party transmission requirement in order for an individual's conduct to fall under the "money transmitter" definition. As such, we decline to add any third party or "middleman" requirement to the money transmitter definition found in section 560.103(23). See Seagrave v. State, 802 So.2d 281, 287 (Fla. 2001) ("[I]t is a basic principle of statutory construction that courts 'are not at liberty to add words to statutes that were not placed there by the Legislature.' " (quoting Hayes v. State, 750 So.2d 1, 4 (Fla. 1999) ) ).
In contrast, the federal definition of "money transmitter" does include a third party transmission requirement. See 31 C.F.R. § 1010.100(ff)(5)(i)(A) (2014) (outlining that a "money transmitter" under federal law means a person engaged in the "acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means" (emphasis added) ). Thus, if our Legislature had intended the unambiguous language of section 560.103(23) to include the limiting words "to a third party," it would have included them. See State v. Debaun, 129 So.3d 1089, 1095 (Fla. 3d DCA 2013) ("[C]ourts may not invade the province of the legislature and add words which change the plain meaning of the statute." (citation omitted) ).
Here, it is undisputed that Espinoza received currency (cash in U.S. dollars) for the purpose of transmitting monetary value or payment instruments (Bitcoin, which qualifies as both) by means of the Internet or other businesses that facilitate such transfer. However, the trial court imposed a bilateral limitation on the statutory definition of "money transmitter" not present in the statute. Under its reading, the phrase "transmitting the same by any means" would require Espinoza to both receive and transmit the same form of currency, monetary value or payment instrument for a transaction to fall within the ambit of section 560.103(23). In other words, if Espinoza received currency, he would have to transmit currency; if he received monetary value, he would have to transmit monetary value; and if he received a payment instrument, he would have to transmit a payment instrument. We disagree with this limitation.
The phrase "the same" modifies the list of payment methods or forms of value that includes "currency, monetary value, or payment instruments." The use of the word "or" is in the disjunctive and, as such, any of the three qualifies interchangeably on either side of the transaction. To hold otherwise, which would necessitate that the types of traditionally recognized money transmitting businesses, *1066 such as the trial court's Western Union example, receive only cash in order to transfer cash, would insert an additional requirement into the statute that is not presently there. Inasmuch, the ability of a customer to use a credit card, personal check, or cashier's check as a means of payment for the transfer of cash using the services of a Western Union-type money transmitting business would be impermissible under the trial court's reading of section 560.103(23). The difference between the trial court's Western Union example and the conduct at issue herein is that traditional Western Union-type money services businesses are registered as such with the Florida OFR. Espinoza's bitcoins-for-cash business is not.
In United States v. Murgio, 209 F.Supp.3d 698, 704-05 (S.D.N.Y. 2016), a case involving the Florida statutes applicable here, the United States Government alleged that the defendant, Murgio, operated and conspired to operate Coin.mx, a Bitcoin exchange, as an unlicensed money transmitting business in violation of federal and Florida law. The Government's allegations stemmed from an alleged scheme to bribe the chairman of the board of a federal credit union in order to hide the illegal nature of Coin.mx. Id. at 705. The Government alleged that "Murgio and his co-conspirators attempted to shield the true nature of his Bitcoin exchange business by operating through several front companies, including one known as 'Collectables Club,' to convince financial institutions that Coin.mx was just a members-only association of individuals interested in collectable items, like stamps and sports memorabilia." Id.
However, the district court rejected Murgio's argument that bitcoins are not covered by Florida's definition of "money transmitter" on the basis that they are not "currency, monetary value, or payment instruments" under Florida law. Id. at 712. In so doing, it reasoned that because bitcoins function as a "medium of exchange, whether or not redeemable in currency," they fall within Florida's express definitions of "monetary value" and "payment instruments." Id. (explaining that "[b]ecause bitcoins are 'monetary value,' they are also 'payment instruments' ").
The district court further rejected Murgio's invocation of the rule of lenity, as do we, as a valid basis to decline application of chapter 560's definition of "monetary value" or "payment instrument" to bitcoins "because there is no statutory ambiguity here." Id. It reasoned that "the rule of lenity is particularly inapt in the context of Chapter 560, given that Bitcoin's raison d'être is to serve as a form of payment." Murgio, 209 F.Supp.3d at 712( citing Getting started with Bitcoin, Bitcoin, https://bitcoin.org/en/getting-started (last visited Sept. 16, 2016) ).
We agree with the district court's conclusion in Murgio that "there is no plausible interpretation of 'monetary value' or 'payment instruments,' as those terms are used in Chapter 560 that would place bitcoins outside of the statute's ambit." Id. at 713.[4] See also *1067 United States v. Faiella, 39 F.Supp.3d 544, 545 (S.D.N.Y. 2014) (finding that Bitcoin clearly qualifies as "money" or "funds" for purposes of the federal money transmitter statute because "Bitcoin can be easily purchased in exchange for ordinary currency, acts as a denominator of value, and is used to conduct financial transactions" (citing SEC v. Shavers, No. 4:13-CV-416, 2013 WL 4028182, at *2 (E.D.Tex. Aug. 6, 2013) ) ).
The defendant in Faiella was charged, in connection with the operation of an underground market in Bitcoin, with one count of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960 (2012). Faiella, 39 F.Supp.3d at 545. The defendant argued that Bitcoin did not qualify as "money" under federal law. Id. at 545. The district court rejected that assertion and found that Bitcoin qualifies as "money" where the plain meaning of that term is "something generally accepted as a medium of exchange, a measure of value, or a means of payment." Id. (quoting Money , Merriam-Webster's Collegiate Dictionary (11th ed. 2009) ). Similarly, because Bitcoin unambiguously serves as a "medium of exchange," it necessarily qualifies as "monetary value" for purposes of sections 560.125(1) and 560.125(5)(a).
In another recent case, the United States Supreme Court examined the definition of "money remuneration" in Wisconsin Cent. Ltd. v. United States, --- U.S. ----, 138 S.Ct. 2067, 201 L.Ed.2d 490 (2018). Specifically, Wisconsin Cent. Ltd . concerned whether stock options qualified as "money remuneration" under the Railroad Retirement Tax Act of 1937. Id. at 2070. Looking to the ordinary meaning of the words at the time Congress enacted the statute, the United States Supreme Court ultimately concluded that stock options did not fall under the definition of "money remuneration." Id. at 2074-75 ("The problem with the government's and the dissent's position today is not that stock and stock options weren't common in 1937, but that they were not then-and are not now-recognized as mediums of exchange."). However, the Court recognized that, although a statute's meaning is fixed at the time of enactment, "new applications may arise in light of changes in the world." Id. at 2074. Thus, the Court further held that " 'money,' as used in this statute, must always mean a 'medium of exchange.' But what qualifies as a 'medium of exchange' may depend on the facts of the day." Id. Although Bitcoin did not exist at the time the registration requirements of chapter 560 were enacted, Bitcoin undoubtedly qualifies as a "medium of exchange" and Espinoza's bitcoins-for-cash business requires him to register as a payment instrument seller and money transmitter under chapter 560.
Finally, Espinoza argues that his conduct is even farther removed from what could be contemplated by the Florida money services statutes than the final order entered in In re Petition for Declaratory Statement Moon, Inc., Case No. 59166 (Fla. OFR Apr. 6, 2015) (available from agency clerk). This is not the case. Moon, Inc., sought an opinion from the Florida OFR whether its business would require licensing under Florida law. Id. Moon's business plan contemplated the establishment of a Bitcoin kiosk utilizing an existing Florida licensed money services business that would process Bitcoin transactions. Id. A Moon customer would give U.S. dollars to the money services business in exchange for a PIN (personal identification number). Id. The customer would enter the PIN into one of Moon's kiosks. The kiosk would then initiate a transfer of bitcoins from an address owned by Moon Id. Once the PIN is redeemed, the money services business would then pay Moon. Id.
In opining that Moon's proposed business activities did not fall within Florida's *1068 money transmitting licensing statutes, the Florida OFR found that Moon was not receiving currency, monetary value, or payment instruments for the purpose of transmitting same. In re Petition for Declaratory Statement Moon, Inc., Case No. 59166 (Fla. OFR Apr. 6, 2015) (available from agency clerk). Rather, Moon merely facilitated the transfer of bitcoins through the use of a licensed money services business. Id. Here, no licensed money services business was utilized in the exchange of U.S. dollars for bitcoins that occurred between Espinoza and Detective Arias. As such, we find Moon's activities patently different from those engaged in by Espinoza.
First, Moon's customers' initial contact and deposit of U.S. dollars were with a licensed money services business. Second, the PIN provided by the licensed money services business to Moon's customers provided a mechanism by which the exchange of U.S. dollars for bitcoins could be identifiable and traceable to a specific customer and transaction, a scenario far different from the anonymity provided by the transactions conducted between Detective Arias and Espinoza.[5]
B. Money Laundering (Counts 2 and 3)
"As this court on more than one occasion has stated, the purpose of a Rule 3.190(c)(4) motion is to test the legal sufficiency of the charges brought by the State, it is not to require the State to demonstrate that it will secure a conviction at trial." State v. Yaqubie, 51 So.3d 474, 479 (Fla. 3d DCA 2010). Accordingly, this Court has consistently held that a Rule 3.190(c)(4)"motion to dismiss should be granted only where the most favorable construction to the State would not establish a prima facie case of guilt. And if there is any evidence upon which a reasonable jury could find guilt, such a motion must be denied." State v. Terma, 997 So.2d 1174, 1177 (Fla. 3d DCA 2008) (quoting State v. McQuay, 403 So.2d 566, 567-68 (Fla. 3d DCA 1981) ).
Further, when considering a motion to dismiss pursuant to Rule 3.190(c)(4), the trial court may not make factual determinations, weigh conflicting evidence, or consider the credibility of witnesses. See State v. Ortiz, 766 So.2d 1137, 1142 (citing State v. Fetherolf, 388 So.2d 38, 39 (Fla. 5th DCA 1980) ). "Even if the trial court doubts the sufficiency of the state's evidence, it cannot grant a motion to dismiss criminal charges simply because it concludes that the case will not survive a motion for a judgment of acquittal." Id. (quoting State v. Paleveda, 745 So.2d 1026, 1027 (Fla. 2d DCA 1999) ).
On a Rule 3.190(c)(4) motion, the State is "entitled to the most favorable *1069 construction of the evidence with all inferences being resolved against the defendant." Ortiz, 766 So.2d at 1142. Rule 3.190(c)(4) levies no obligation on the State to pre-try its case; rather, the State is only required to provide sufficient facts to demonstrate that a reasonable jury could rule in its favor. See State v. Arnal, 941 So.2d 556, 558 (Fla. 3d DCA 2006). The State, in order to defeat a motion to dismiss, "need only specifically dispute a material fact alleged by the defendant or add additional material facts that meet the minimal requirement of a prima facie case." State v. Kalogeropolous, 758 So.2d 110, 112 (Fla. 2000). Thus, denial of the motion to dismiss is mandatory so long as a material fact is in dispute. Id. (citing Boler v. State, 678 So.2d 319, 323 (Fla. 1996) ).
The State charged Espinoza with two counts of money laundering, in violation of sections 896.101(5)(b) and (5)(a), Florida Statutes (2014).[6] Counts 2 and 3 state:
COUNT 2
And the aforesaid Assistant State Attorney, under oath, further information makes MICHELL ABNER ESPINOZA, on or about February 06, 2014, in the County and State aforesaid, did unlawfully conduct or attempt to conduct a financial transaction involving property or proceeds which an investigative or law enforcement officer, or someone acting under such officer's direction, represented as being derived from, or as being used to conduct or facilitate, specified unlawful activity, to wit: identity theft and/or credit card theft and/or violation of Chapter 817, when a person's conduct or attempted conduct was undertaken with the intent to promote the carrying on of said specified unlawful activity and/or avoid a transaction reporting requirement under state law, said financial transaction(s) totaling or exceeding $ 20,000 but less than $ 100,000 in the 12-month period ending February 6, 2014, in violation of s. 896.101(3) and s. 896.101(5)(b), Fla. Stat., contrary to the form of the Statute in such cases made and provided, and against the peace and dignity of the State of Florida.
COUNT 3
And the aforesaid Assistant State Attorney, under oath, further information makes MICHELL ABNER ESPINOZA, on or between December 05, 2013 and February 01, 2014, in the County and State aforesaid, did unlawfully, conduct or attempt to conduct a financial transaction involving property or proceeds which an investigative or law enforcement officer, or someone acting under such officer's direction, represented as being derived from, or as being used to conduct or facilitate, specified unlawful activity, to wit: identity theft and/or credit card theft and/or violation of Chapter 817, when a person's conduct or attempted conduct was undertaken with the intent to promote the carrying on of said specified unlawful activity and/or avoid a transaction reporting requirement under state law, said financial transaction(s) exceeding $ 300 but less than $ 20,000 in the 12 month period ending February 1, 2014, in violation of s. 896.101(3) and s. 896.101(5)(a), Fla. Stat., contrary to the form of the Statute *1070 in such cases made and provided, and against the peace and dignity of the State of Florida.
In response, Espinoza filed a sworn motion to dismiss wherein he incorporated his prior arguments as to Count 1 and further averred that the sale of bitcoins does not fall within the statutory definitions of "financial transactions" or "monetary instruments" under section 896.101. As such, Espinoza argued, his sale of bitcoins to Detective Arias does not constitute money laundering. The State moved to strike on the basis that a motion to dismiss a charge of money laundering is improper because money laundering requires "intent."
Section 896.101(3)(c) provides in part:
(3) It is unlawful for a person:
....
(c) To conduct or attempt to conduct a financial transaction which involves property or proceeds which an investigative or law enforcement officer, or someone acting under such officer's direction, represents as being derived from, or as being used to conduct or facilitate, specified unlawful activity, when the person's conduct or attempted conduct is undertaken with the intent :
1. To promote the carrying on of specified unlawful activity;
(emphasis added). Clearly, the statute requires intent. Irrespective thereof, the trial court determined Espinoza lacked the necessary intent because, in its view, there was "no evidence that [Espinoza] did anything wrong, other than sell his Bitcoin to an investigator who wanted to make a case."[7] However, "[k]nowledge is an ultimate question of fact and thus not subject to a motion to dismiss." See Graves v. State, 590 So.2d 1007, 1007 (Fla. 3d DCA 1991) (citations omitted); see also Yaqubie, 51 So.3d at 480 (explaining that intent and state of mind "is usually inferred from the circumstances surrounding the defendant's actions. Since the trier of fact has the opportunity to weigh the evidence and judge the credibility of the witnesses, it should determine intent or state of mind" (quoting State v. Rogers, 386 So.2d 278, 280 (Fla. 2d DCA 1980) ) ). Accordingly, in dismissing the information, the trial court improperly decided a factual issue regarding Counts 2 and 3 in concluding Espinoza lacked the requisite intent under section 896.101(3)(c). See State v. Book, 523 So.2d 636, 638 (Fla. 3d DCA 1988) (holding that "intent or state of mind is not an issue to be decided on a motion to dismiss under Rule 3.190(c)(4)").
Further, the trial court made clear in its dismissal order that, among numerous other materials, it reviewed the arrest affidavit and depositions of Detective Arias in order to decide Espinoza's motion to dismiss. Detective Arias repeatedly told Espinoza about the illicit nature of his own activities, which formed the basis for his desire to trade the ill-gotten cash for bitcoins. This sworn testimony should have prompted the trial court to deny the motion to dismiss as to Counts 2 and 3. See State v. Gutierrez, 649 So.2d 926, 928 (Fla. 3d DCA 1995) ("On a motion to dismiss, if the affidavits and depositions filed in support of or in opposition to the motion create material disputed facts, it is improper for the trial court to determine factual issues and consider the weight of conflicting *1071 evidence or the credibility of witnesses." (citations omitted) ).
Finally, while questioning-but stopping short of declaring unconstitutional on the basis of vagueness and/or overbreadth-Florida's money laundering statutes, the trial court concluded the State's case would not survive a motion for judgment of acquittal when it determined that there was "insufficient evidence as a matter of law that [Espinoza] committed any of the crimes as charged."[8] However, the trial court is not permitted to grant a motion to dismiss based on serious doubts as to whether certain charges can survive a motion for judgment of acquittal. See Ortiz, 766 So.2d at 1142 ("Even if the trial court doubts the sufficiency of the state's evidence, it cannot grant a motion to dismiss criminal charges simply because it concludes that the case will not survive a motion for a judgment of acquittal." (quoting Paleveda, 745 So.2d at 1027 ) ).
VI. CONCLUSION
In conclusion, based on the foregoing, we reverse the trial court's order granting Espinoza's motion to dismiss the information and remand for further proceedings consistent with this opinion.
Reversed and remanded with instructions.

After Espinoza's arrest, the Legislature amended section 560.125(1) to include the following language: "A deferred presentment transaction conducted by a person not authorized to conduct such transaction under this chapter is void, and the unauthorized person has no right to collect, receive, or retain any principal, interest, or charges relating to such transaction." See § 560.125(1), Fla. Stat. (2014). Accordingly, the State charged Espinoza under the prior version of the statute.

Espinoza did not cross-appeal the trial court's finding that his conduct involving Detective Arias and Bitcoin constituted a financial transaction within the ambit of Chapter 896, Florida's Money Laundering Act.

Section 560.103(11) defines "currency" as:
[T]he coin and paper money of the United States or of any other country which is designated as legal tender and which circulates and is customarily used and accepted as a medium of exchange in the country of issuance. Currency includes United States silver certificates, United States notes, and Federal Reserve notes. Currency also includes official foreign bank notes that are customarily used and accepted as a medium of exchange in a foreign country.

Murgio was decided after the trial court rendered its decision and during the pendency of this appeal and, as a result, the Murgio court was able to-and did-acknowledge and discuss the trial court's opinion. 209 F.Supp.3d at 713. It noted the trial court limited its discussion to "currency" and "payment instruments" and "did not contemplate the possibility that bitcoins qualify as "monetary value." Id. The district court further noted some factual differences between the conduct alleged in Murgio and in the instant case. Id. However, we do not find those differences dispositive given the standard applicable to the trial court's-and our-review of a Rule 3.190(c)(4) motion under the Florida Rules of Criminal Procedure. Id. at 714.

The FATF Virtual Currency Report notes that:
[d]ecentralised systems are particularly vulnerable to anonymity risks. For example, by design, Bitcoin addresses, which function as accounts, have no names or other customer identification attached, and the system has no central server or service provider. The Bitcoin protocol does not require or provide identification and verification of participants or generate historical records of transactions that are necessarily associated with real world identity. There is no central oversight body and no AML [anti-money laundering] software currently available to monitor and identify suspicious transaction patterns. Law enforcement cannot target one central location or entity (administrator) for investigative or asset seizure purposes (although authorities can target individual exchangers for client information that the exchanger may collect). It thus offers a level of potential anonymity impossible with traditional credit and debit cards or older online payment systems, such as PayPal."
FATF, supra, at 9.

The definition of "monetary instruments," which itself is used in the definition of "financial transaction," was amended by the Legislature to include the term "virtual currency" and became effective on July 1, 2017. See § 896.101(2)(f), Fla. Stat. (2017). However, the Legislature's subsequent amendment to this statute is irrelevant to our analysis as we are only considering the prior version that was in effect at the time of the transactions at issue here.

At the May 27, 2016 hearing, the testimony of Espinoza's own expert undercut defense counsel's reliance on FinCEN guidelines promulgated on March 18, 2013, when the expert testified that the FinCEN guidance meant "if somebody wanted to buy and sell Bitcoins as a business with the public that the person should register at the federal level as a money transmitter."

See Williams v. State, 154 So.3d 426, 428 (Fla. 4th DCA 2014) ("A motion for judgment of acquittal should be granted only when it is apparent that no legally sufficient evidence has been submitted under which a jury could find a verdict of guilty.").